ARNOLD G. PESSIN AND FRANCES PESSIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4901–63.    Filed July 16, 1965.

*Bart A. Brown, Jr.*, for the petitioners.
*Richard M. Schwartz*, for the respondent.

PIERCE, *Judge:*  Respondent determined a deficiency of $7,377.16 in the income tax of the petitioners, Arnold G. Pessin and Frances

Pessin, for their taxable calendar year 1959. Said petitioners are husband and wife residing in Lexington, Ky.; and they filed a joint income tax return for said year with the district director of internal revenue at Louisville, Ky. The issues here involved concern only the husband, Arnold G. Pessin, whom we will hereinafter refer to as the petitioner.

The issues for decision are:

(1) Whether during said taxable year, the petitioner realized unreported taxable income of $17,380, as determined by respondent, in connection with an auction sale of four thoroughbred yearling horses; and

(2) Whether also during said taxable year, the petitioner realized additional unreported taxable income of $2,465, as determined by respondent, in connection with the sale of a racehorse named "Shirley Jones."

One other issue raised by the pleadings is whether the respondent erroneously disallowed a medical deduction for said taxable year in the amount of $139.22—by reason of the limitation on such a deduction which is imposed by section 213 of the 1954 Code. Petitioners presented no evidence in support of this issue, and also made no mention of the same in their briefs; and therefore this issue is regarded as having been abandoned.

Some of the facts have been stipulated, and they are hereinafter so found. The stipulation of facts and all exhibits therein identified are incorporated herein by reference.

*Issue 1*

### FINDINGS OF FACT

The petitioner is a veterinarian who specializes in the treatment of thoroughbred horses in and around the Bluegrass area of central Kentucky. During the taxable year he practiced his profession in partnership with another veterinary named R. E. Lee, under the firm name of Lee & Pessin. In addition, petitioner actively engaged in the purchase and sale of thoroughbred horses, both as a principal and also on behalf of his partnership and of various individuals.

In the latter part of October 1959, the annual fall public auction sale of horses was being held at the Keeneland racetrack in Lexington. Petitioner attended that sale, as had been his custom for many years; and while there he met Edward (Ted) Wortman with whom he was well acquainted, and who was the owner of the Silver Creek Farm which engaged in the breeding and raising of thoroughbred horses. Wortman then introduced petitioner to a man named Thomas W. Kelley, who was a horsetrainer whom petitioner had not previously known.

Kelley had just come to Lexington for the purpose of buying some horses as the agent of Ethel Haffa of Chicago, Ill., who owned a stable of racehorses. Kelley informed petitioner of his mission, and inquired whether petitioner knew of any horses that might be available for purchase at private sale. Petitioner replied that he did not at the time know of any such horses, but that he would look around and keep Kelley's inquiry in mind.

On the following day, which was October 19, 1959, petitioner again went to the Keeneland horse sale, and there he again met Wortman and Kelley who were conversing with each other. Petitioner then advised Kelley that he had found four yearling thoroughbred horses which he believed could be purchased; and that these yearlings were in the sales barn at the Keeneland track awaiting sale later in the day at the public auction. Kelley, Wortman, and petitioner then went to the sales barn together to see these horses.

The four yearlings involved were owned by a farmer and horse-breeder named Clay Simpson, who had consigned them for sale at the auction through Breeders Sales Co., Inc. At the barn the above parties saw the horses; and found that they were there in charge of an associate of Simpson, named Hisle, who had authority to show them but who had no authority to sell them without Simpson's approval. Kelley asked Hisle the price of the yearlings, and the latter said it was $10,500 for all four. Petitioner, Kelley, and Wortman agreed that this figure would be a fair price; and Hisle then said that he would contact the owner, Simpson, and determine whether the latter would be willing to sell the yearlings for said amount.

On the evening of this same day (October 19, 1959), Simpson went to Keeneland track pursuant to a telephone call which he had received from Hisle; and he there met Hisle, petitioner, and Wortman. Petitioner then began negotiations with Simpson regarding the sale of the four yearlings. Kelley was not present; and there is no evidence as to what, if anything, Wortman said during the negotiations. The final result of said negotiations was that Simpson agreed to sell all four yearling horses to petitioner on the following terms:

The sale price for all four yearlings would be $10,500, less selling expenses of $855—so as to yield net proceeds to Simpson of $9,645. Simpson regarded the above-mentioned sale price to be the fair market value of the four horses; and, as hereinbefore found, petitioner had previously agreed with Kelley and Wortman that said figure was a fair price.

Simpson and petitioner agreed that the horses would have to go through the auction sale, which was then about to commence; for Simpson had previously consigned and cataloged the yearlings for the auction, and if he withdrew them, he would be subject to a penalty.

It was further agreed by petitioner that Simpson would, however,

be guaranteed the above-mentioned net proceeds of $9,645—so that if the amount for which the four horses were sold in the auction was insufficient to yield Simpson said net amount, he would be reimbursed for the deficiency; and if the auction yielded Simpson more than the above-mentioned net amount, he would pay over the excess to petitioner.

No downpayment was received by Simpson in connection with the above private sale arrangement.

Almost immediately after the above terms had been agreed upon by petitioner and Simpson, the four yearlings were taken into the auction ring for sale; and there the following events occurred. Pursuant to a prior secret arrangement between Kelley and petitioner, of which Simpson had no knowledge, Kelley and petitioner became the bidders at the auction for two of the four yearlings involved. Pursuant to said secret arrangement, petitioner would first make a bid for said two yearlings, and then Kelley would overbid him; and this prearranged method of competitive bidding continued until the two yearlings were finally declared by the auctioneer to have been sold to Kelley as the highest bidder, for a total price of $27,000. The other two yearlings involved were sold at the auction to unidentified persons for an aggregate price of $3,900. Thus the end result was that the total price for which all four of the yearling horses involved were sold at the auction through Breeders Sales Co., Inc., was $30,900. This amount was $20,400 more than the price for which Simpson had agreed to sell all four horses immediately preceding their sale at the auction.

Kelley, in so buying the two first-mentioned yearlings at the auction, acted as the agent for Ethel Haffa of Chicago; and immediately after he had been declared to be the winning bidder, he signed the sales contract for the horses at the auction sales office, in the name of Ethel Haffa. Wortman was not a participant in the above-mentioned competitive bidding; and there is no evidence that he in any way either participated in or made any payment in connection with the auction sale of any of the four yearling horses involved. The purpose of petitioner and Kelley in competitively bidding up the horses to a figure in excess of their recognized fair market value, was to defraud Ethel Haffa whom Kelley represented as her agent; and for petitioner and Kelley to thereafter retain for their own benefit, the difference between the auction price of the horses and the amount which petitioner had agreed to pay Simpson out of such auction price.

About a week or two after the auction sale, Breeders Sales Co., Inc., forwarded to Clay Simpson its check which was made payable to his order in the amount of $29,525. This amount represented the aggregate auction sale price of $30,900 for the four yearlings which said sales company had collected from Ethel Haffa and the other pur-

chasers—less its selling fees of $1,375. Petitioner, upon learning that this check had been so issued, contacted Simpson and requested that the amount by which said check exceeded $9,645 (being the agreed amount which Simpson was to retain) be turned over to him (the petitioner). Simpson, however, had by this time become suspicious of what had occurred; and he not only refused to make any immediate settlement, but informed petitioner that he had referred the matter to his attorney, William B. Gess, in order that he might be fully protected. Thereafter attorney Gess made an investigation of the facts, by having several telephone conversations with petitioner, by conferring on the long-distance telephone with Wortman, who Simpson had noticed was present at the time when petitioner made the arrangement for the private purchase of the horses, and by also obtaining a letter from Wortman which confirmed their telephone conversation. Thereafter, Gess checked all the information which he so obtained against the facts supplied to him by Simpson; and he then prepared a written memorandum to be executed by both petitioner and Simpson, which embodied the facts which his investigation had revealed. He next arranged for a conference to be held in his office, at which the final settlement between petitioner and Simpson would be effected.

The above-mentioned conference was held in attorney Gess' office on November 18, 1959. Petitioner, Simpson, and Gess were all present. The written memorandum which Gess had prepared was thereupon carefully read in the presence of all; and the same was then executed by petitioner and Simpson in the presence of witnesses who also affixed their signatures. This written memorandum (which has been received in evidence herein) recited the facts regarding petitioner's purchase of the four yearling horses from Simpson on October 19, 1959; and it also contained the following material statement:

4. That the party of the second part [who was petitioner], for and in consideration aforesaid, does hereby specifically agree to keep and hold the party of the first part [who was Clay Simpson], his heirs and personal representatives, free and harmless from all liability arising out of or in anywise connected with the foregoing transaction [the sale of the four yearling horses] and said party of the second part represents and warrants that negotiating and consummating the purchase of the aforementioned yearlings he was acting solely for and in his own individual behalf and not as the agent or representative of any third party * * *.

Following the execution of said written memorandum, Simpson endorsed and delivered to petitioner the said check of Breeders Sales Co., Inc., in the sum of $29,525, which represented the net proceeds from the sale of the four yearlings at public auction on October 19, 1959; and petitioner at the same time issued and delivered to Simpson his personal check in the sum of $9,645, which represented the agreed private sale price of said four yearlings in the gross amount of $10,500, minus $855 which was allowed to petitioner for expenses and com-

missions. Petitioner then left the conference; and promptly thereafter, he deposited the said Breeders Sales Co. check, in the amount of $29,525, in his own personal checking account at the Citizens Union Bank & Trust Co., at Lexington.

Following the deposit of the above-mentioned check, petitioner on the same date of November 18, 1959, issued against his said personal checking account, two checks as follows: Check for $2,500 made payable to the order of Lee & Pessin, which was the veterinary partnership of which he was one of the two equal partners; and check for $4,500 made payable to the order of William G. Clark, who was a farmer and horsebreeder who resided in Midway, Ky. And 6 days later, under date of November 24, 1959, petitioner issued another check against his said personal checking account to the order of Thomas W. Kelley in the amount of $12,380. This latter payee (Kelley) was the same person who, as the result of the above-mentioned competitive bidding at the auction sale, had there purchased for Ethel Haffa, as her agent, two of the four yearling horses here involved.

The respondent, in his notice of deficiency herein, determined that petitioner realized from the above-mentioned transactions regarding the four yearling horses, gross income in the amount of $17,380 which he did not report in his 1959 income tax return; and respondent also determined that the amounts of the two checks which petitioner had issued to Clark and Kelley (totaling $16,880) involved "kickback payments" and that no portion thereof is deductible by petitioner either as an ordinary and necessary business expense under section 162, or under any other section of the 1954 Code.

Regarding the above check which petitioner issued to William G. Clark, Wortman and petitioner had in October 1959 visited Clark's farm in Midway, Ky., to look at a thoroughbred colt named "We Will." Clark at that time offered to sell the colt for $5,000; and either petitioner or Wortman (Clark was not sure which of them) accepted that offer. Thereafter, on November 18, 1959, petitioner personally delivered two checks to Clark at the Keeneland racetrack in full payment for said colt. One of these was a check for $500 which was signed "Silver Creek Farm, by Edward Wortman," and which bore a notation that it pertained to the purchase of the colt "We Will"; and the other was the above-mentioned check of petitioner in the amount of $4,500 which bore a notation reading "Commission for horses." Clark received both of these two checks in full payment of the agreed price of $5,000 for the above-mentioned colt. There was no amount owing to him by either petitioner or Wortman for any commissions.

Regarding the above-mentioned check for $12,380 which petitioner issued to Kelley on November 24, 1959, Kelley received this check; but he included only 50 percent of that amount ($6,190) in the gross

income which he reported on his 1959 income tax return. Petitioner, at the time of issuing said check to Kelley, did not owe the latter any amount—unless it was in connection with the secret arrangement between him and Kelley pertaining to the above-described purchase and auction sale of the four yearling horses.

OPINION

Petitioner's position on brief with respect to this first issue is, in substance, that he did not at any time acquire any interest in any of the four yearling horses involved; but that in his negotiations with Simpson for the private purchase of these horses and in his competitive bidding with Kelley on two of these horses at the auction sale and in his subsequent collection and disbursement of the proceeds from the auction sale, he acted only as an "agent" for some "true purchaser" whom he does not definitely identify as his principal, but who he suggests may have been either "Kelley or Kelley and Wortman." This position is directly contrary to the position which he took in the written memorandum that he executed with Clay Simpson in attorney Gess' office on November 18, 1959—wherein he specifically represented and warranted that in negotiating and consummating the private purchase of said four horses, "he was acting solely for and in his own individual behalf and not as the agent or representative of any third party." Also petitioner's present position, as well as many of the statements included in his testimony, in his prior statements to examining revenue agents, and in his verified pleadings filed with this Court, is inconsistent with the facts established by the testimony of other witnesses whom we regard to be credible. By reason of all this, we are impelled to conclude that petitioner's present position, and also much of his testimony, is unacceptable, untruthful, and not worthy of belief.

After seeing and hearing all the witnesses testify, and also after carefully considering and weighing all of the evidence, we have reached the following conclusions.

1. We are convinced beyond any reasonable doubt that, shortly before the auction sale of the four yearling horses on October 19, 1959, petitioner and Kelley entered into an unethical conspiracy to defraud Kelley's principal and employer, Ethel Haffa, in the private purchase and subsequent auction sale of said horses. The nature and substance of such conspiracy was this: First, that petitioner would "buy" these horses from Simpson, without the knowledge of Ethel Haffa, under an arrangement whereby Simpson would receive out of the proceeds from the subsequent auction sale of these horses, only the net amount of $9,645, with any balance to be turned over to petitioner. Second, that petitioner and Kelley would then bid against each other for two of the horses at the auction sale, for the purpose of establishing an

auction sale price to be paid by Ethel Haffa, as Kelley's principal and employer, which not only would be far in excess of the amount for which Kelley could have purchased these horses for his said employer, and which also would be far in excess of their fair market value. And third, that petitioner would then collect the net auction sale proceeds (which were $29,525); pay Simpson the agreed private sale price of $9,645; and then divide between Kelley and himself, for their own benefit and without the knowledge of Ethel Haffa, the balance of said proceeds (which were $19,880). Petitioner and Kelley carried out this conspiracy as planned. Petitioner has failed to prove, and the credible evidence does not establish, that any third party was a participant in the conspiracy.

2. Kelley's share of said net proceeds of $19,880 from the conspiracy between him and petitioner was $12,380—represented by the check for this amount which petitioner issued to Kelley out of his personal bank account on November 24, 1959. We hold that said amount of $12,380 does not constitute taxable income to petitioner.

3. Petitioner's share of said net proceeds from the above-mentioned conspiracy was the balance of $7,500; and this constituted unreported gross income of petitioner. Of this amount,

$2,500 was turned over by petitioner to his partnership. The respondent, in his notice of deficiency herein, treated this amount as a deduction from petitioner's income; and he then included an equal amount in the income of the partnership and charged petitioner with his distributable share of the additional partnership net income. This adjustment was not in controversy herein.

$4,500 was turned over by petitioner to William G. Clark in partial payment for the colt named "We Will." We hold that this amount constituted a capital expenditure of petitioner, and that no portion thereof is deductible by him either as an ordinary and necessary business expense, or otherwise.

The remaining $500 of petitioner's said share was retained by him, was not reported in his 1959 income tax return, and no portion thereof is deductible by him. As shown in the notice of deficiency herein, an assessment with respect to this $500 was made on June 28, 1963, pursuant to an agreement with petitioner.

4. The correct amount of the deficiency in the income tax of petitioner and his wife for the taxable year here involved, will be determined under Rule 50.

## Issue 2

### FINDINGS OF FACT AND OPINION

In January 1959, the partnership of Lee & Pessin owned an undivided interest in a racehorse named "Shirley Jones," which was sold at that time for $75,000, less commission expense of $5,000—or net

proceeds of $70,000. Petitioner deposited said net proceeds in his personal bank account, and then made disbursements from said proceeds as follows:

| | |
|---|---|
| To Lee & Pessin partnership | $20,000 |
| To J. S. Jones, a partial owner | 23,882 |
| To Charles Levin, a partial owner | 23,653 |
| Total amount disbursed | 67,535 |

The partnership of Lee & Pessin reported the $20,000 which it received, as long-term capital gain on its 1959 partnership return. The difference of $2,465 between the net proceeds of $70,000 from the sale of the horse, and the total amount of the above disbursements of $67,535, was not accounted for by petitioner, nor was the same reported on either the 1959 partnership return or on petitioner's 1959 income tax return.

The respondent, in his notice of deficiency herein, determined that said unaccounted-for and unreported amount of $2,465, constituted additional gross income of the petitioner for the taxable year here involved, and that no portion thereof is deductible.

The petitioner, at the trial herein, contended that he had paid out said amount of $2,465 to grooms, exercise boys, and "hot walkers"; and that the amount is deductible by him as an ordinary and necessary business expense. He failed, however, to present any evidence which would tend to establish either the identity of any such payee, or the date of any such payment, or the amount paid to any particular person.

We sustain the respondent's determination as to this issue, by reason of the lack of substantiation and failure of proof by the petitioner.

*Decision will be entered under Rule 50.*