ARNOLD G. PESSIN AND FRANCES PESSIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3441–69.   Filed December 29, 1972.

---

474

*F. Selby Hurst,* for the petitioners.
*Dennis M. Feeley,* for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies in petitioners' income tax and additions to tax as follows:

| Taxable year | Deficiency | Addition to tax sec. 6653(a) [1] |
|---|---|---|
| 1965 | $74,012.30 | $3,700.62 |
| 1966 | 31,940.57 | 1,597.03 |

The issues presented for our consideration are:

(1) Whether the receipt of the nominations by Dr. Pessin constituted taxable income to the extent of the fair market value of the nominations as determined by respondent; and

(2) Whether petitioners are subject to the additions to tax for the taxable years 1965 and 1966 under section 6653(a), I.R.C. 1954.

### FINDINGS OF FACT

All stipulated facts are found as stipulated.

Petitioners Arnold G. Pessin and Frances Pessin are husband and wife who at the time the petition was filed resided in Lexington, Ky.

During the taxable years involved, petitioner Arnold G. Pessin was a veterinarian specializing in the treatment and care of horses. Petitioner also during the years in issue was in the business of breeding horses, trading in property rights in horses, and rendering advice in connection with the promotion of syndications of thoroughbred racehorses. During such years Dr. Pessin was a partner in a partnership doing business under the name of Winchester Farms, Lexington, Ky.

Petitioners kept their books and records on the cash basis and filed their joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue, Louisville, Ky.

On February 26, 1965, John R. Gaines of Lexington, Ky., purchased from Rex C. Ellsworth of Chino, Calif., an undivided one-half interest in three thoroughbred racehorses named "Candy Spots, Prove It, and Olden Times" for the price of $1,800,000.

A syndication agreement was entered into between Ellsworth and Gaines with respect to Candy Spots, Prove It, and Olden Times. The syndication agreement was effected some time early in 1965 but the exact date is not disclosed by the record.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

The syndication agreement provided for the division of the ownership of the horses into 30 shares. Each shareholder was entitled to one nomination in each of the aforementioned stallions for each share owned by him for the useful life of the horses. The shares were freely transferable and assignable. The shareholders would share in any profits in the sale of extra breeding rights not used by the shareholders or nomination holders and were required to pay their proportionate shares of expense in maintaining the stallions. The agreement provided that the shares were to be sold for $120,000.

Some time in 1965, Ellsworth conveyed one assignable nomination in the Candy Spots syndicate to Dr. Pessin. On March 1, 1965, Ellsworth wrote a letter (on the letterhead of Dr. Pessin) addressed to petitioner which reads, in part, as follows:

This is to confirm our oral understanding that, in consideration of your agreement to,—so long as you are able to do so,—render such assistance and advice as I may require from time to time in connection with the interests represented by my shares in the three stallions, CANDY SPOTS, OLDEN TIMES and PROVE IT, I hereby assign to you, your heirs and assigns, the use of one (1) nomination to each of them in each breeding season for the respective lives of the stallions, under one of my shares in the CANDY SPOTS, OLDEN TIMES AND PROVE IT SYNDICATE, subject to the terms of the Syndicate Agreement.

On March 30, 1965, Dr. Pessin wrote a letter to Harold Sherman which reads, in part, as follows:

I hereby assign to you for the sum of $50,000 one (1) of the nominations which I have to each of the three stallions CANDY SPOTS, OLDEN TIMES and PROVE IT, in each breeding season for the respective lives of the stallions, subject of course to the terms and conditions of the Syndicate Agreement relating to such nominations.

Shares in the Candy Spots syndicate were in fact sold for $120,000 each.

The shareholders in the Candy Spots syndicate, according to the syndication agreement, shared expenses and income proportionately from the sale of extra breeding rights as follows:

| Year | Expenses | Income |
|------|---------|--------|
| 1967 | $37, 065. 50 | $22, 500 |
| 1968 | 19, 636. 00 | 40, 000 |
| 1969 | 21, 598. 00 | 50, 000 |
| 1970 | 20, 409. 92 | 60, 000 |

The net gain by shareholders from the sale of extra breeding rights after deducting their shares of expenses for the years 1967 through 1970 averaged less than $1,000 per share.

On November 2, 1965, Leslie Combs II of Lexington, Ky., syndicated a thoroughbred horse named "Fleet Nasrullah." The Fleet Nasrullah syndication agreement divided the ownership of the horse into 30 shares and offered them for sale at $35,000 per share. The

agreement provided that each nomination holder and each shareholder was to receive one free nomination in the stallion for each share or nomination owned by him for the life of the horse.

The Fleet Nasrullah agreement reads, in part, as follows:

(2) Each of the thirty (30) shares shall be on an equal basis with the others and shall be indivisible, and only a full share shall have any rights hereunder; provided, however, that there is expressly reserved, and the within sale is made subject to free nominations to FLEET NASRULLAH each year during life for each of the following, their heirs and assigns:

Three (3) for Hanes & Combs, Inc.

Five (5) for Ellwood B. Johnston & Dr. A. G. Pessin

(3) FLEET NASRULLAH shall stand and shall be kept and maintained at Spendthrift Farm, Iron Works Pike in Fayette County, Kentucky, under the sole personal management and supervision of Leslie Combs II and he shall be entitled to charge and receive the prevailing rates for stallion keep. Leslie Combs II shall have complete charge of advertising the stallion and shall have the authority to select a veterinarian. Owners of shares shall pay all charges, costs and expenses incurred in connection with said stallion in the proportion that their respective shares bear to the whole number of shares.

(4) Each shareholder in each breeding season shall be entitled to one (1) free nomination to said stallion for each share owned by him, subject to the payment of his share of the Syndicate expenses and the provisions of Paragraph 5.

(5) If Leslie Combs II, with the advice and approval of the veterinarian shall determine that FLEET NASRULLAH shall be bred to less than thirty-eight (38) mares in any stud season, then the Shareholders and those persons holding the eight (8) free nominations in each year (as provided in Paragraph 2 herein) who collectively shall be entitled to such reduced number of nominations shall be determined by lot, and any Shareholder or holder of said free nominations who has suffered by reason of the drawing of lots in any season shall not be submitted to the risk of drawing in any subsequent season unless and until all other Shareholders and holders of said free nominations have suffered as the result thereof; and for the purpose of this clause each share and free nomination shall be regarded as if it were the subject of separate ownership and shall be on an equal basis, the one with the other. Notice of the decision to reduce FLEET NASRULLAH'S book to less than thirty-eight (38) nominations and of the time and place of the drawing shall be sent by the Syndicate Manager to each Shareholder and holder of a free nomination by registered mail or by telegram at least five (5) days prior to said drawing.

(6) If the veterinarian attending said stallion and the Syndicate Manager, Leslie Combs II, shall certify that in their opinion FLEET NASRULLAH'S book could be increased without injury to said stallion, additional yearly seasons may be sold by the Syndicate Manager and the yearly proceeds thereof divided equally between the thirty (30) shares.

As indicated in paragraph (2) hereinabove, petitioner received three assignable nominations in the Fleet Nasrullah syndicate in 1965 from Leslie Combs II. Petitioner sold two of these nominations in 1967 for $50,000 each and the remaining nomination was sold in 1968 for $25,000.

The shares in the Fleet Nasrullah syndicate were in fact sold for $35,000 each.

On December 31, 1965, Mrs. H. W. Morrison sold a nomination in Fleet Nasrullah to Tartan Farm for $35,000. Petitioner acted as agent for her on this sale.

The average profit for the shareholders in the Fleet Nasrullah syndicate for the years 1966 through 1970, after deduction of expenses, was $1,162.26.

Calumet Farm traded a share in the Fleet Nasrullah syndicate for a nomination in the syndicate in December of 1965.

On June 24, 1966, Leslie Combs II and Bwamazon Farm, a division of Waldheim Realty Co., syndicated a thoroughbred horse named "Creme Dela Creme." The Creme Dela Creme syndication agreement provided that ownership of the horse was to be divided into 30 shares and the shares were to be offered for sale at $40,000 each. The agreement also provided that Dr. Pessin was to receive two assignable nominations in the horse. Each shareholder and each nomination holder had the right to one nomination in the horse for each year of the life of the horse for each share or nomination owned by him. The agreement further provided that the shareholders were to share in the profits from the sale of extra breeding rights and racing earnings but were required to share in the expenses of maintaining the stallion.

The syndication agreement also provided, in part, as follows:

(3) CREME DELA CREME is presently in training under the care and supervision of Bwamazon Farm. He shall continue in training and racing under the sole management and in the colors of Bwamazon Farm, which shall determine among others, in its sole discretion, how long he shall race and when he will be retired from racing; provided, however, that in any event he shall be retired to stud not later than December 31, 1968. The actions and decisions of Bwamazon Farm with respect to the foregoing matters shall be conclusive and binding upon the Shareholders and shall not give rise to any liability so long as it acts in good faith. The owners of the thirty (30) shares shall share proportionately the earnings and expenses of CREME DELA CREME during his future racing career and the owners of the free nominations referred to above shall not participate therein. Bwamazon Farm, acting alone, shall have full authority to execute such leases or other documents as may be required to qualify CREME DELA CREME to race.

(4) After his retirement to stud CREME DELA CREME shall stand at Spendthrift Farm, Ironworks Pike, in Fayette County, Kentucky, under the general management and supervision of Leslie Combs II as Syndicate Manager, who shall receive for his services the prevailing rates for stallion keep. In the event of the death of Leslie Combs II or the sale or other disposition of Spendthrift Farm, then the horse may be removed to another stud farm in Central Kentucky, and a successor Syndicate Manager may be appointed by the vote of the owners of a majority of the shares in the Syndicate at a meeting called for that purpose. Each Shareholder shall pay his proper share of the expenses of the Syndicate proportionate to the number of shares which he owns.

(5) Each Shareholder in each breeding season after CREME DELA CREME'S retirement to stud shall be entitled to one (1) free nomination to CREME DELA CREME for each share owned by him, subject to the payment of his pro rata share of the expenses and to the provisions of paragraph (6) herein. Each share and each free nomination shall be regarded as if it were the subject of separate ownership and shall be on an equal basis, the one with the other.

The normal book of the stallion shall be thirty-four (34) mares in each breeding season, but if in the opinion of the Syndicate Manager the health and condition of the stallion will permit, then additional mares may be bred to him in any breeding season after the first year at stud at the regularly advertised service fee and the proceeds received therefrom shall be distributed pro rata to the Shareholders. Each mare bred to CREME DELA CREME must be in sound breeding condition and free from infection or disease, and no mare shall be covered more than six (6) times in any breeding season.

(6) If the Syndicate Manager, with the advice and approval of the veterinarian, shall determine that CREME DELA CREME shall be bred to less than thirty-four (34) mares in any stud season, then the Shareholders and those persons holding the four (4) free nominations in each year (as provided in paragraph (2)) who collectively shall be entitled to such reduced number of nominations shall be determined by lot, and any Shareholder or holder of said free nominations who has suffered by reason of the drawing of lots in any season shall not be submitted to the risk of drawing in any subsequent season unless and until all other Shareholders and holders of said free nominations have suffered as the result thereof, and for the purpose of this clause each share and free nomination shall be regarded as if it were the subject of separate ownership and shall be on an equal basis, the one with the other. Notice of the decision to reduce CREME DELA CREME'S book to less than thirty-four (34) nominations and of the time and place of the drawing shall be sent by the Syndicate Manager to each Shareholder and holder of a free nomination by registered mail or by telegram at least five (5) days prior to said drawing.

\*        \*        \*        \*        \*        \*        \*

(8) Shares may be transferred subject to the terms of this agreement and the provisions of paragraph (9) herein. A Shareholder may sell his nomination in any season for his own account or may trade or use his nomination at his discretion, provided that in the event of a sale or trade of such nomination he shall notify the Syndicate Manager thereof.

\*        \*        \*        \*        \*        \*        \*

(11) The purchasing Shareholders accept delivery of CREME DELA CREME without examination as to his fertility and breeding soundness, as no veterinary examination with reference thereto has been made or will be made prior to his retirement from racing. Seller and Bwamazon Farm make no warranties or representations of any kind, either express or implied, and the purchasing Shareholders accept delivery of their undivided fractional interests in said horse as is, as of the date hereof, and assume any and all risks incident to the ownership of their interests thereafter. Neither Seller nor Bwamazon Farm shall be responsible for insuring CREME DELA CREME, but each Shareholder may at his election insure his separate interest for his own benefit.

\*        \*        \*        \*        \*        \*        \*

(13) The undersigned hereby subscribes for one (1) free nomination in the Syndicate (as provided in Paragraph (2)) and Seller has conveyed one (1) free nomination to the undersigned, subject to all of the terms and conditions herein.

    \*          \*          \*          \*          \*          \*          \*

WITNESS the hand of the undersigned as of the day and year first above written.

(S)  A. G. PESSIN D.V.M.

_____

_____

_____

Address

Approved and accepted:

(S)  LESLIE COMBS II

    _Seller_

BWAMAZON FARM, A DIVISION OF
WALDHEIM REALTY COMPANY,

By_____

Dr. Pessin sold the two nominations which he received in Creme Dela Creme in 1968 for $22,500 each.

The shareholders incurred a net loss on Creme Dela Creme for the years 1967 through 1970 in that the total expenses from the sale of breeding rights exceeded the total income for that period.

For purposes of this case, the birth date of the following horses is determined by the method used by the thoroughbred industry which is that a horse is 1 year old on January 1 of the year following the year of birth. Birth years of the horses involved herein are as follows:

| Name of horse | Year of birth |
| --- | --- |
| Candy Spots | 1960 |
| Prove It | 1957 |
| Olden Times | 1958 |
| Fleet Nasrullah | 1955 |
| Creme Dela Creme | 1963 |

Petitioners reported $50,000 ordinary income on their joint 1965 Federal income tax return as "commissions" which income pertained to the Candy Spots, Prove It, and Olden Times syndicate.

Petitioners filed Federal income tax returns for the taxable years 1967 and 1968 and reported therein the sale of the nominations in Fleet Nasrullah and Creme Dela Creme as the sale of capital assets with a zero basis.

ULTIMATE FINDINGS

The nomination in the Candy Spots syndicate was received by petitioner no earlier than the date of syndication.

The three nominations in the Fleet Nasrullah syndicate were received by petitioner on the date of syndication.

The two nominations in the Creme Dela Creme syndicate were received by petitioner on the date of syndication.

The value of the nomination in the Candy Spots syndicate as of the date of receipt by petitioner was $75,000.

The value of each of the nominations received by petitioner in the Fleet Nasrullah syndicate was $23,000.

The value of each of the nominations received by petitioner in the Creme Dela Creme syndicate was $20,000.

OPINION

## Issue 1. Valuation of Stallions

Respondent determined that during the taxable year 1965 petitioner received one free nomination (breeding right) in each of three stallions named "Candy Spots," "Prove It," and "Olden Times"; three free nominations in a stallion known as Fleet Nasrullah; and during the taxable year 1966, he received two free nominations in a stallion named "Creme Dela Creme"; and that these nominations were received for his services and as such constitute taxable income under section 61(a)(1)[2] of the Code of 1954 equal to their fair market value at the time of receipt. Essentially, it is respondent's position that there is no significant difference in value between an assignable nomination received by petitioner and a share in the stallion in question, and since there is no dispute as to the fair market value of the shares of the syndicate involved, then the nominations in controversy would have the same values as the shares as of the date of syndication. Petitioner, in opposition, contends that he sold his entire interest in one of his nominations in the Candy Spots syndication in 1965 and properly reported the full gain realized thereon as ordinary income in his income tax return for that year. Petitioner contends further that the other nominations in controversy, Fleet Nasrullah and Creme Dela Creme, were received by him prior to the date of effective syndication of the stallions involved which made their value speculative so that the nominations had no market value or a market value substantially less than the price of a share created under the contracts syndicating the stallions.

Respondent's determination of fair market value is presumptively correct and the burden of proving error is on petitioners. *Lester E. Dellinger*, 32 T.C. 1178, 1185–1186 (1959).

---

[2] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

Income Tax Regs.:

Sec. 1.61–2. Compensation for services, including fees, commissions, and similar items.

(d) *Compensation paid other than in cash*—(1) *In general.* If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. * * *

In the instant case, our ultimate findings of the fair market value for the nominations in controversy on the date of the receipt of this property by petitioner represents our conclusion based upon a consideration of the relevant testimony, exhibits, and stipulated facts in the entire record. Although we have, to a large extent, relied upon the testimony of petitioner's witnesses, John H. Clark and Kent P. Hollingsworth, for the reasons hereinafter set forth we are unable to accept the precise value determined by them. We have also given careful consideration to the views expressed by Ronald J. Rollins, respondent's witness.

Although substantially the same principles and rationale apply in ascertaining the fair market value of each of the nominations involved herein, for clarity and convenience of discussion we shall consider each of the syndications separately.

A. Value of the Nomination in Candy Spots, Prove It, and Olden Times Syndicate

Respondent contends that in the taxable year 1965 the petitioners had acquired a breeding right for the lifetime of the stallions known as Candy Spots, Olden Times, and Prove It which had a fair market value of $100,000 at the time of receipt and that petitioners reported only one-half of that amount in their return for 1965 upon the sale of the breeding right to Harold Sherman. Petitioner, on the other hand, maintains that he sold his entire interest in one of the nominations which he had in each of the three stallions in the Candy Spots syndicate to Harold Sherman in 1965 for the total amount of $50,000.

The record shows that on February 26, 1965, John R. Gaines purchased from Rex C. Ellsworth an undivided one-half interest in these three horses for $1,800,000. A syndication of the horses was formed some time in March of 1965 and the syndication agreement divided the ownership into 30 equal shares, each of which was to be sold for $120,000. Following the syndication under the contract, on March 1, 1965, in return for professional services, Ellsworth, a shareholder under the syndication agreement, transferred to Dr. Pessin one breeding right to each of the three stallions, affording petitioner the right to breed one mare annually to each of these stallions. On March 30, 1965, the same month of the acquisition, Dr. Pessin sold an interest in the breeding right he had received from Ellsworth to Harold Sherman for $50,000; and in their income tax return for that year, the petitioners reported the $50,000 payment as "commissions" and paid the tax on that amount as ordinary income. Respondent's agent, Ronald J. Rollins, made an adjustment with respect to this transaction by increasing petitioners' income in the amount of $50,000. He testified that he made this adjustment because petitioner had sold "part" of

his interest in the nomination in the Candy Spots, Prove It, and Olden Times syndicate to Harold Sherman, with whom he was in partnership in a farm (Winchester Farms), and therefore the whole interest acquired by petitioner was worth $100,000.

Respondent contends that there is no significant difference between a share and an assignable nomination in the Candy Spots syndicate and since the shares in the syndicate were being sold at $120,000, the value of a nomination involved herein would be at least $100,000 at the time of receipt. It is respondent's position that petitioner sold half of a nomination worth $100,000 to his partner for use as an asset in the partnership, and that by reporting $50,000 petitioner indicated that he believed half of the value of the nomination in question to be $50,000. Petitioner urges that since there was a bona fide sale of the entire breeding right in question for $50,000 to Harold Sherman shortly after its acquisition, the sale should be conclusive as to the value of the right acquired.

Petitioner testified that in 1965 he sold an entire breeding right in the three stallions included in the Candy Spots syndicate to Harold Sherman for $50,000, who in turn contributed this right to a newly formed partnership with petitioner (formed after the sale to Sherman), who likewise contributed a breeding right in the same syndicate which he had received from John R. Gaines. In support of this testimony, petitioner introduced into evidence a letter on his letterhead dated March 30, 1965, addressed to Sherman which states that Dr. Pessin assigned one of the nominations in question to Sherman for $50,000. However, we believe that their partnership agreement or the testimony of Sherman might have shed more light on this. Sherman did not appear as a witness and his absence is unexplained. In the absence of more convincing evidence, we hold that Dr. Pessin sold one-half of a breeding right in the Candy Spots syndicate to Sherman in 1965. Therefore, we must determine the fair market value of the entire nomination in dispute at the time petitioner received it in that year.

Petitioner's main contention that the nominations in the Candy Spots syndicate (as well as in the Fleet Nasrullah and Creme Dela Creme syndicates) conveyed to him in consideration for his services in attempting to syndicate the stallions involved were absolute and not contingent upon the successful sale of shares or syndication of the horses is without foundation in the record. By suggesting that the nomination in the Candy Spots syndication was received prior to effective syndication, petitioner seeks to minimize the value of the nominations in controversy (and particularly in the Fleet Nasrullah and Creme Dela Creme syndications, discussed *infra*), and argues that if

the syndication was not consummated, the nomination in question would be extremely speculative in value.

The only evidence in the record that fixes the time of the receipt of the nominations under review are the syndication agreements and the vague and inconclusive testimony of petitioner. Whereas the syndication agreements appear to grant the nominations simultaneously with the creation of the syndication, petitioner testified that he received the nominations by an oral grant some 2 weeks prior to each syndication. Petitioner could not precisely state the date of the syndications other than "Sometime in March of '65," and was equally imprecise as to when he received the nominations in controversy. No documentary evidence to substantiate petitioner's assertion that the nominations in question were received prior to syndication was introduced into evidence. We have only the uncorroborated testimony of Dr. Pessin to support his contention and we find his testimony in this regard unconvincing. Absent any underlying agreements prior to the formal syndication in the record between Dr. Pessin and the parties organizing the Candy Spots syndication (as well as the other two syndications involved herein), we must conclude that no one had a right to transfer any nominations in the Candy Spots syndicate (or in the other syndications) until acquisition of legal title to the stallions involved by effective syndication.

We find it difficult to believe that breeding rights worth substantial amounts of money were granted to Dr. Pessin prior to actual syndication with no written documentation whatsoever. While we recognize that there is considerable trust and relative informality among parties in some commercial activities, we find petitioner's testimony in this regard unacceptable. Cf. *Arnold G. Pessin*, 44 T.C. 590, 596 (1965). Without affirmative evidence to the contrary, we believe that the nominations in the Candy Spots syndicate (as well as the other syndicates) were granted to him only in the event of a successful syndication. If the syndication did not materialize, petitioner had no property rights in the stallions involved. The nominations in controversy were created by a successful syndication and are evidenced thereby. In the case of the Candy Spots syndication, petitioner could not have received the nominations from Rex Ellsworth prior to syndication as the nomination was derived from a share not in existence prior to syndication.

Assuming *arguendo* that Dr. Pessin had received the nominations in controversy by oral grant sometime prior to actual syndication of the stallions, we believe that he should have presented a corroborating witness to support his position on this vital matter. At least one of the parties who participated in the creation of the syndications

involved herein, who was familiar with the underlying facts, could presumably have enlightened us as to the nature of the promotional agreement with petitioner, particularly with respect to the exact date when Dr. Pessin received the nominations, if it had been favorable to his cause. *Wichita Terminal Elevator Co.*, 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947).

We find no merit in respondent's contention that there was virtually no difference in the value of the property rights between a share and a nomination in the Candy Spots syndicate (as well as in the Fleet Nasrullah and Creme Dela Creme syndicates) and hence the reasoning which applies in determining the fair market value of a share in any particular syndicate herein would apply equally in fixing the value of a nomination in the Candy Spots syndicate or in the other two syndicates. In support of his position, respondent introduced records of the Candy Spots syndicate which show that net gain of shareholders in this syndicate from the sale of extra breeding rights after deducting their shares of expenses for the years 1967 through 1970 (years which are not before us) averaged less than $1,000 per share. Respondent's argument, predicated largely upon hindsight, is not convincing. Unless a fertility test of the horse involved is made prior to syndication, neither the shareholder nor the nomination holder in a new syndicate have the advantage of hindsight in determining the future fertility of the stallion involved. No affirmative evidence was adduced by respondent showing that participants in the Candy Spots syndication had such information prior to the effective syndication. Moreover, it is noteworthy that after some thoroughbred racehorses (not involved here) have been syndicated for stud purposes, fertility tests indicated sterility and some famous racehorses have become totally sterile after siring only a few live foals. Unlike the nomination holder, the shareholder, among other things, participates in any money earned from breeding the stallion to mares in excess of those required under the syndication agreement; he must bear his proportionate share of the expenses of upkeep of the stallion; and in the Candy Spots syndicate, the shareholder participated in racing prizes. These distinctions are material and, in our view, result in a lesser valuation of the nomination than a share in the syndicate at the time of acquisition.

Petitioner presented two witnesses who testified as to the valuation of the nominations in question. They based their valuations upon the assumed fact (which we have held to be without merit) that the nominations in three syndications involved herein were received a few weeks prior to effective syndication. In this connection, we note that petitioner's witness, John H. Clark, testified that an assignable,

permanent breeding right acquired in each of the stallions in the Candy Spots syndication "a week or more prior to syndication" would have a total value for the right to breed to all three horses of not more than $20,000. Petitioner's other witness, Kent P. Hollingsworth, did not offer any testimony pertaining to the Candy Spots syndication. Suffice it to say if this erroneous assumption is removed from Clark's computation, his valuation has little probative weight.

After an appraisal of all of the relevant factors bearing upon a determination of fair market value, and particularly the different rights of a nomination holder and a shareholder in the Candy Spots syndication, we are of the opinion that in 1965, when petitioner received the nomination in question from Rex Ellsworth, it had a fair market value of $75,000 and have so found as a fact.

### B. Value of the Nominations in the Fleet Nasrullah Syndicate

Petitioner received three lifetime nominations in the Fleet Nasrullah syndicate in 1965. Respondent included the value of these breeding rights in petitioners' income for 1965 in the amount of $35,000 each, the same as the sale price of a share set forth in the syndicate agreement.

The record shows that on November 2, 1965, Leslie Combs II syndicated the thoroughbred stallion Fleet Nasrullah under a contract in which Hanes & Combs, Inc., was designated as seller and the purchaser of a share was designated as buyer. Neither of the petitioners was a party to this contract, although the contract reserved to Dr. Pessin and Elwood P. Johnson five breeding rights in the stallion. Petitioner sold his breeding rights in 1967 and 1968 and reported the sale price of the breeding rights on his joint tax returns as capital gains with a zero basis. Petitioner, at the trial, contended that the nomination in Fleet Nasrullah was worth $8,000 when he received it about 2 weeks before the syndication was effective. It is petitioner's position that three of the five breeding rights reserved under the syndication agreement for him were transferred to him approximately 2 weeks before the syndication for "attempting to syndicate the stallion but they were not contingent upon the successful sale of shares, or syndication, of the stallion." For the same reasons discussed hereinabove as to the Candy Spots syndication, we hold that petitioner received the nominations in controversy on November 2, 1965, the date of the effective syndication of Fleet Nasrullah.

Respondent's position is the same as in the Candy Spots syndicate, that is, there is no material difference between an assignable nomination and a share in the Fleet Nasrullah syndicate, and being the same, they are of the same value. In this connection, respondent introduced

records of the syndicate showing that the average profit per share-holder from stud services for the years 1966 through 1970 was $1,162.26. By multiplying this amount by 6 years of useful breeding life in the stallion, respondent argues that the resultant sum, $6,973.56, represents the maximum possible value attributable to the sale of the extra seasons or breeding rights; and since the shares sold for $35,000, then a nomination could be worth no less than $28,000. Apparently, respondent's computation is predicated on hindsight since the average net profit per shareholder from the sale of extra breeding rights was not known to the shareholders at the date of syndication.

Petitioner's witness, John Clark, valued the nominations in question "prior to syndication" at $14,000 to $17,000. He testified that his valuation would be substantially more if at the time Dr. Pessin received the nominations the syndication were completed and it was known that Fleet Nasrullah was to be managed by Leslie Combs II and was to stand at Spendthrift Farm for both names give "substantial prestige to any stallion." Also he testified that prior to syndication it was known that Fleet Nasrullah averaged 50 live foals per year and since the syndication agreement provided for breeding to 38 mares per season for shareholders and for owners of breeding rights, the share-holders could expect to participate in 12 surplus breedings at $10,000 per service, amounting to a total of $120,000 per year, or gross earnings (in the remaining 3 years of top fertility after syndication) of $12,000 per shareholder, which would not be received by a nomination holder. This factor alone would diminish the value of a nomination in question to $23,000. He then decreased the valuation further to reflect the assumption that the nomination was acquired prior to effective syndication on November 2, 1965.

Petitioner's other witness, Hollingsworth, likewise testified that he valued the nomination in controversy "prior to November 2," when the horse was still located in California and that he would have increased the valuation to $23,000 after syndication when the horse would be under the supervision and control of Leslie Combs II at Spendthrift Farm. This witness, following the same reasoning as Clark, also discounted the value of a nomination in Fleet Nasrullah because a nomination holder would not participate in the net profit expected to be derived from extra stud services.

It is clear that both witnesses for petitioner predicated their valuation on the erroneous assumption that Dr. Pessin received the nomination in question prior to syndication on November 2, 1965. As already discussed hereinabove with respect to the Candy Spots syndication, apart from petitioner's vague testimony, there is no convincing evidence in the record to support this supposition.

We have given consideration to the approach used by petitioner's witnesses, including all of the significant factors bearing upon a determination of fair market value, and we are of the opinion that on November 2, 1965, the nominations in dispute had a fair market value of $23,000 and have so found as a fact.

### C. Value of the Nominations in Creme Dela Creme Syndicate

Respondent determined that petitioner received two nominations in the Creme Dela Creme syndicate in 1966, each of which had a fair market value of $40,000, the same as that of a share in the syndication. Petitioner contends that the value of one of these nominations at the time of receipt was $1,500. As in the case of the other syndications, petitioner avers that he received the nominations about 2 weeks before the effective syndication and that this partly accounts for the low valuation of the nominations. Also, he alludes to the fact that the fertility of the stallion was not known on the date of syndication as affecting the value but generally bases the difference on the fact that the stallion was to continue racing, and he would not share in the prospective earnings.

On June 24, 1966, Leslie Combs II and Bwamazon Farm, a division of Waldheim Realty Co., syndicated Creme Dela Creme. Neither of the petitioners was a party to this syndication; however, the contract reserved to Dr. Pessin two breeding rights to the stallion. He sold his breeding rights in this stallion in 1968 for $22,500 each and in his income tax return for that year accounted for the full amount received for these rights as capital gains with a zero basis.

As in the case of the other two syndications, in the Creme Dela Creme syndicate the shareholders were to participate in the profits of the sale of extra breeding rights and were obliged to bear their proportionate shares of expenses. In an effort to demonstrate that there was actually little or no difference in value between a share and a nomination in the Creme Dela Creme syndication, respondent urges that during 1967 through 1970, inclusive (years which are not before us) the shareholders sustained a net loss on the sale of the extra breeding rights. Respondent assumes that a sophisticated purchaser of a share would reasonably have anticipated this result but, nevertheless, would have bought the share in order to gain access to the stallion. Again, we do not accept respondent's rationale for it is based upon hindsight and conjecture.

Petitioner's witness, Hollingsworth, testified that the value of a nomination in Creme Dela Creme at the time Dr. Pessin acquired his rights was speculative and would range from zero to $15,200, and

that the shares were sold for $40,000 because of the expected racing earnings of this horse. He testified further that Creme Dela Creme was not a stud horse and it was highly speculative if he would become one eventually; and also stated that this horse had not been tested for fertility as distinguished from Fleet Nasrullah which had been an extremely fertile horse and was a proven stallion. Petitioner's other witness, Clark, valued a breeding right to Creme Dela Creme at the time Dr. Pessin acquired his rights therein at $8,000 to $10,000. Both witnesses stated that one of the material reasons for the large differential in value between breeding rights and shares in the case of Creme Dela Creme was that under the syndication agreement, this horse which had an excellent racing record was to continue racing until December 31, 1968; and only shareholders were to participate in racing earnings. Hollingsworth testified that a shareholder could reasonably anticipate participating in total racing earnings in excess of $250,000 from the time of syndication until December 31, 1968. We believe that this factor would have a significant bearing upon the value of a share in contrast to a speculative nomination in a horse whose status as a stallion had not been established.

However, both witnesses for petitioner set the value of the nominations involved in part on the supposition that Dr. Pessin acquired them sometime prior to the effective syndication date, June 24, 1966. As already discussed hereinabove, we deem this erroneous assumption to result in a distorted valuation.

Considering the foregoing and the record as a whole, we are of the opinion that each of the two nominations in controversy had a fair market value on June 24, 1966, when acquired by petitioner, in the amount of $20,000 and have so found as a fact.

## Issue 2. Addition to Tax

Respondent determined an addition to tax under section 6653(a) for the taxable years 1965 and 1966. This section provides that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." Petitioners had the burden to show that no part of any underpayment was due to negligence or intentional disregard of respondent's rules and regulations. *Byron H. Farwell*, 35 T.C. 454 (1960); *Leroy Jewelry Co.*, 36 T.C. 443 (1961).

Petitioners, in their petition, allege that their returns were based on all information available to them and their certified public accountants and were filed without any negligence or intentional disregard of respondent's rules and regulations. Petitioners did not introduce any

evidence at the trial pertaining to this issue, although they argued on brief that it would be inequitable to impose the addition to tax because "there is much pending litigation over breeding rights of this sort."

We recognize that in some cases which involved substantial questions of law and fact, and the complexity of the issues created confusion and uncertainty, we have held that the addition to tax under section 6653(a) would be inappropriate. *William N. Dillin,* 56 T.C. 228, 248 (1971); *Douglas J. Lemery,* 54 T.C. 480, 490 (1970). Such is not the case here. During the taxable year 1965, petitioner received three nominations in Fleet Nasrullah, each of which we have found to have a fair market value of $23,000 at the time of acquisition. Likewise, during the year 1966, he received two nominations in Creme Dela Creme, each of which we held to have a fair market value of $20,000 at the date of receipt by him. However, petitioner reported the value of these nominations to be zero when he sold them in 1967 and 1968. The law is settled that under section 61 of the 1954 Code if services are paid for other than in money, the fair market value of the property taken in payment must be included in income. Sec. 1.61-2, Income Tax Regs. There is no uncertainty as to petitioner's legal obligation in this respect under the facts presented. Furthermore, the ultimate responsibility for a correct return lies with the taxpayer who must furnish the necessary information to his agent who prepared his return. See *Elsie SoRelle,* 22 T.C. 459, 489 (1954). Petitioner has the burden of establishing that he at least supplied the correct information to his accountant with respect to the nominations in question and that the incorrect returns were a result of the accountant's mistakes. *Herbert Enoch,* 57 T.C. 781, 803 (1972). We are not convinced that he supplied such information. As the petitioner has not met this burden, the additions to tax under section 6653(a) are proper.

In his notice of deficiency, respondent allowed depreciation on the nominations involved herein for the years 1965 and 1966 in the respective amounts of $7,604.17 and $27,386.36. Petitioner, in his answer, contested respondent's determination on the ground, *inter alia,* that the useful lives of the stallions were shorter than that proposed by respondent. Petitioner, who has the burden of proof, did not introduce any evidence at the trial with respect to this issue nor did he discuss it in his brief. In view of our conclusions hereinabove as to the fair market value of the nominations at the time of acquisition by petitioner, respondent's determination of depreciation must be adjusted under Rule 50, although the lives of the stallions will not be disturbed.

*Decision will be entered under Rule 50.*