RAS OF SAND RIVER, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
RAS of Sand River, Inc. v. Commissioner
Docket No. 5877-88
United States Tax Court
T.C. Memo 1990-322; 1990 Tax Ct. Memo LEXIS 345; 59 T.C.M. (CCH) 1010; T.C.M. (RIA) 90322; June 27, 1990, Filed *345 Decision will be entered under Rule 155. Held: Petitioner was a personal holding company within the meaning of section 542(a) during the taxable year in issue and is, therefore, subject to the personal holding company tax imposed under section 541. Held further: No deduction is allowed with respect to payments made to one of petitioner's employees who, in addition, was also a shareholder, because petitioner failed to prove that the payments, which were designated as "per diem," constituted an ordinary and necessary business expense. Held further: Petitioner is liable for additions to tax under sections 6653(a)(1) and 6653(a)(2). Held further: Petitioner is also liable for an addition to tax under section 6661. Robert C. Anderson, for the petitioner. Terry L. Zabel, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION As set forth in his statutory notice dated December 23, 1987, respondent determined a deficiency in the amount of $ 19,815.08 in petitioner's Federal income tax for the tax year ended June 30, 1984. Respondent also determined additions to tax for that year as follows: Additions to Tax
Section
Section
Section
6653(a)(1) [1] *346 6653(a)(2)
6661
$ 990.76 *
$ 4,953.77 After concessions, [2] *347 the issues for decision are: (1) Whether petitioner was a personal holding company within the meaning of section 542(a) during the taxable year in issue and is, therefore, subject to the personal holding company tax imposed under section 541; (2) whether a deduction is allowed with respect to payments, designated as "per diem," that petitioner made to one of petitioner's employees who, in addition, was also a shareholder; (3) whether petitioner is liable for additions to tax under sections 6653(a)(1) and 6653(a)(2); and (4) whether petitioner is liable for an addition to tax under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. [3] The stipulations and exhibits attached thereto are incorporated herein by reference. Petitioner is a Michigan corporation which had its corporate headquarters in Marquette, Michigan, at the time the petition in this case *348 was filed. Richard A. Sinervo, the person from whom petitioner's name was derived, joined the United States Navy after he graduated from high school. Mr. Sinervo served as an electrician's mate in the Navy from 1959 to 1964. Beginning in 1965 and ending in 1967, Mr. Sinervo worked as a roving operator at the Dairyland Power Cooperative, a nuclear power plant in LaCrosse, Wisconsin. While he was on that job, Mr. Sinervo received training in certain aspects of safety and general power plant operation. Mr. Sinervo subsequently spent 2 years working for the Maryland Naval Shipyard where he was involved in a shipbuilding program. Thereafter Mr. Sinervo worked in the submarine overhaul division of the Newport News Shipbuilding and Drydock Company in Newport News, Virginia. Mr. Sinervo worked in the quality control department of the Duke Power Company after he left the Newport News Shipbuilding and Drydock Company. In about 1974, Mr. Sinervo took a job with the Philadelphia Gas and Electric Company at the Salem Nuclear Power Plant in southern New Jersey. Initially, Mr. Sinervo worked in the startup department. Mr. Sinervo later became involved, for the first time in his career, in *349 heating, ventilation, and air conditioning (HVAC) work. Mr. Sinervo verified that the contractor who was supposed to be doing the HVAC work for the utility company actually got it done. Mr. Sinervo's next job was with Sargent and Lundy, a general engineering contractor in the power plant building industry, in Chicago, Illinois. Mr. Sinervo worked for Sargent and Lundy for about a year before taking a job with Consumer's Power in Midland, Michigan. Consumer's Power planned to operate a nuclear power plant which was in the initial stages of construction. Mr. Sinervo worked with a 200- to 300-person start-up group which consisted of approximately 10-percent utility company employees and 90-percent employees of contractors. Mr. Sinervo also did some HVAC work on the office building which was built in conjunction with the nuclear power plant. Although it never became operational, Mr. Sinervo worked at the nuclear power plant for over 3 years until mid-1980. The reason Mr. Sinervo originally took the job with Consumer's Power was because he had promised his two children, Richard E. Sinervo and Patricia A. Sinervo, that they could start and finish high school at the same school. Prior *350 to that time, Mr. Sinervo moved his family as often as necessitated by his frequent changes of employment. Around the time he quit working for Consumer's Power, Mr. Sinervo considered starting his own business to do contract work in the nuclear power industry. Mr. Sinervo believed that contractors temporarily working at nuclear power plants often earned more than regular utility company employees who worked at those same plants during the construction stage and after operations commenced. Gene Kennedy, a personal friend of Mr. Sinervo's, also encouraged Mr. Sinervo to form his own company. Mr. Kennedy worked for Power Management Consultants Corp. (PMCC), a general contractor which entered subcontracts with businesses such as the one contemplated by Mr. Sinervo. Mr. Sinervo sought the advice of his brother Vincent T. Sinervo, who is an accountant, regarding various aspects of starting a business. Upon the advice of his brother and several other people with whom he had consulted, Mr. Sinervo decided to incorporate the business in order to limit liability. Mr. Sinervo considered the liability exposure to be substantial with respect to contracting work done in the nuclear power industry. *351 By incorporating, Mr. Sinervo also sought to take advantage of certain fringe benefits, including a pension plan and a medical reimbursement plan, which could be offered through a corporation. Petitioner was subsequently organized as a Michigan corporation for the following purpose, which was set forth in its articles of incorporation: "to engage in, conduct and carry out the practice of consulting engineer and to do all things appropriate for rendering the services required in conjunction therewith." Petitioner filed its articles of incorporation, which were dated December 9, 1980, with the Michigan Department of Commerce on January 9, 1981. Petitioner issued two stock certificates dated December 19, 1980. One stock certificate, reflecting ownership of 45 shares of capital stock, was issued to Mr. Sinervo and the other stock certificate, reflecting ownership of 455 shares of capital stock, was issued to Wm. E. and Janet M. Enright. Mr. and Mrs. Enright are very good friends of Mr. Sinervo and his wife, Rita A. Sinervo. The two couples originally became acquainted with each other at a time when they were next door neighbors. Mr. and Mrs. Sinervo constituted petitioner's original *352 board of directors and continued to serve on that board thereafter. Mr. and Mrs. Sinervo also have served as petitioner's president and secretary-treasurer, respectively, since its inception. At a meeting of stockholders and directors held in August 1983, Mr. and Mrs. Sinervo's son and daughter were elected as vice-presidents of petitioner and made members of its board of directors. On May 1, 1984, Mr. Sinervo executed a "Waiver of Notice of Annual Meeting of Shareholders" of petitioner and scheduled said meeting for May 11, 1984, in Las Vegas, Nevada. Mr. Sinervo executed that document on his own behalf and on behalf of Mr. and Mrs. Enright, who were not in attendance when that meeting was subsequently held. Since its formation, petitioner has engaged in a number of different business activities through the efforts of its four employees, Mr. and Mrs. Sinervo and their son and daughter. Foremost among those activities was subcontract work performed by Mr. Sinervo during the construction stage of three nuclear power plants. Petitioner subcontracted with PMCC, which dealt with utilities in the nuclear power industry. Of petitioner's four employees, only Mr. Sinervo was capable *353 of doing the HVAC and other work subcontracted for by petitioner. Mr. Sinervo's capability stemmed primarily from on-the-job training and work experience gained by him throughout his career. Mr. Sinervo obtained neither formal HVAC training and education nor a license to do such work. Petitioner's first subcontract with PMCC called for work to be done at the Grand Gulf Nuclear Power Station near Vicksburg, Mississippi. Mr. Sinervo worked on that job from 1981 until sometime in early 1983. Next, petitioner subcontracted with PMCC for work to be done at the Clinton Nuclear Plant near Clinton, Illinois. Mr. Sinervo worked on that job, which involved mostly HVAC work, during part of 1983 and throughout 1984. Mr. Sinervo and his family lived in rental houses in Mahomet, Illinois, while Mr. Sinervo was working at the Clinton Nuclear Plant. After the first rental house in which Mr. and Mrs. Sinervo lived was sold, they moved into a second rental house. Finally, petitioner subcontracted with PMCC for work to be done at the River Bend Station in Baton Rouge, Louisiana. Petitioner subsequently shifted the emphasis of its business from subcontracting to the performance of tax-related *354 services, including return preparation, which it previously had been offering to individuals and small businesses. The shift away from subcontracting was due at least in part to a broken leg suffered by Mr. Sinervo in November 1985 and to a downturn in the nuclear power industry. Petitioner also opened a video store in 1986. Since selling the video store in late 1986 or early 1987, petitioner essentially has been inactive, conducting no business and holding no significant assets. Petitioner carried on its activities as a subcontractor for PMCC under an oral agreement until petitioner and PMCC executed a written subcontract on August 6, 1984, and August 8, 1984, respectively. Petitioner and PMCC encountered undisclosed problems which apparently prevented them from entering a written subcontract sooner. The "Compensation Package" appended to the written subcontract pertained specifically to work which had already been done by petitioner at the Grand Gulf Nuclear Power Station. [4] Petitioner and PMCC attempted to make the written subcontract retroactive to the date petitioner began such work by virtue of the following provisions: AGREEMENT, Made this 12th day of January, 1981, between *355 POWER MANAGEMENT CONSULTANTS CORP. (First Party) and RAS, Inc. of Sand River, (Second Party). * * * 4. DURATION OF CONTRACT The term of this Contract shall commence the 12th day of January, 1981, and shall continue until terminated by either Party.
From the outset, petitioner anticipated expanding its subcontract work beyond that which could be accomplished by Mr. Sinervo. Petitioner sought to establish a base of employees by gathering resumes from people qualified to perform subcontract work. Petitioner gathered resumes from over 3,000 people and attempted to find work for some of those people by presenting their resumes to utility *356 companies that had work which needed to be done. Petitioner's attempts at finding work for particular people, who it could then employ, failed because the utility companies declined to deal directly with petitioner. Instead, the utility companies dealt with general contractors such as PMCC. The utility companies either accepted or rejected the people whose resumes had been presented by petitioner. Mr. Sinervo, who was already employed by petitioner, was subject to that same selection process. PMCC arranged work for the other people who were accepted by utility companies with which it had a general contract. PMCC paid petitioner a fee based upon the number of hours worked by those people on the particular jobs for which they were accepted. However, Mr. Sinervo was the only person ever employed by petitioner to perform subcontract work. Mrs. Sinervo, who had previously worked for an accountant in Midland, Michigan, rendered the various tax-related services which petitioner offered to individuals and small businesses. Mrs. Sinervo also discharged certain administrative duties, such as bookkeeping and bill paying, on behalf of petitioner. Mrs. Sinervo gathered information for preparation *357 of petitioner's Federal income tax returns and Mr. Sinervo's brother prepared such returns. The advice of Mr. Sinervo's brother was sought in connection with income tax and business management matters which were of concern to petitioner. Mr. and Mrs. Sinervo's son and daughter, the only other employees of petitioner, assisted in different aspects of petitioner's business. The daughter, who split her time during the tax year in issue between Mahomet, Illinois, and Orlando, Florida, performed screening and filing work with respect to the resumes gathered by petitioner. She also performed some work in connection with the various tax-related services offered by petitioner. The son, who was a marketing major attending college in Oxford, Mississippi, during the tax year in issue, developed a marketing plan for petitioner and helped it market its services. He also performed some work in connection with the resumes gathered by petitioner. On petitioner's Federal income tax return for the tax year in issue, petitioner reported income in the amount of $ 115,426.53. That amount included gross profit and interest totaling $ 112,172.79 and $ 3,253.74, respectively. Petitioner received $ *358 108,311.51 from PMCC during the tax year in issue. Petitioner also claimed certain "other deductions" on a schedule attached to its return, including a deduction in the amount of $ 11,100, which was designated as "per diem paid." In his notice of deficiency, respondent determined, inter alia, that (1) petitioner was a personal holding company during the taxable year in issue and is, therefore, subject to the personal holding company tax in the amount of $ 14,405.40; (2) a deduction in the amount of $ 11,100 for "per diem paid" is not allowed; and (3) petitioner is liable for additions to tax under sections 6653(a)(1), 6653(a)(2), and 6661. Both parties made concessions with respect to other determinations set forth in respondent's notice of deficiency. OPINION Personal Holding Company Tax
Section 541 imposes on any personal holding company a personal holding company tax equal to 50 percent of the undistributed personal holding company income. A personal holding company is a corporation which satisfies both the tainted income test and the stock ownership test set forth in section 542(a). A corporation satisfies the stock ownership test if, at any time during the last half of the *359 taxable year, more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. Sec. 542(a)(2). A corporation satisfies the tainted income test if at least 60 percent of its "adjusted ordinary gross income" for the taxable year constitutes "personal holding company income." Sec. 542(a)(1). Section 543, which defines personal holding company income, provides in pertinent part as follows: (a) GENERAL RULE. -- For purposes of this subtitle, the term "personal holding company income" means the portion of the adjusted ordinary gross income which consists of: * * * (7) PERSONAL SERVICE CONTRACTS. -- (A) Amounts received under a contract under which the corporation is to furnish personal services; if some person other than the corporation has the right to designate (by name or by description) the individual who is to perform the services, or if the individual who is to perform the services is designated (by name or by description) in the contract; and (B) amounts received from the sale or other disposition of such a contract.
This paragraph shall apply with respect to amounts received for services under a particular contract *360 only if at some time during the taxable year 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for the individual who has performed, is to perform, or may be designated (by name or by description) as the one to perform, such services. [5]
Petitioner concedes that its outstanding stock was owned by five or fewer individuals. However, petitioner challenges respondent's determination that the $ 108,311.51 which petitioner received from PMCC during the tax year in issue constituted personal holding company income. Resolution of that dispute depends on whether petitioner received that amount pursuant to *361 a personal service contract. [6]
Two statutory tests must be met in order for a contract to be considered a personal service contract within the meaning of section 543(a)(7). Kenyatta Corp. v. Commissioner, 86 T.C. 171, 183 (1986), affd. 812 F.2d 577 (9th Cir. 1987).First, a designation test requires that the individual who is to perform the services be designated, by name or by description, in the contract or that such individual can be so designated by some person other than the corporation. Sec. 543(a)(7)(A). Second, a stock ownership test *362 requires that the person designated to perform services own at least 25 percent of the corporation's stock at some time during the taxable year. The 25-percent stock ownership test is set forth in the flush language of section 543(a)(7). Petitioner bears the burden of proof with respect to the issue of whether the income in question in this case was derived from a personal service contract and was, therefore, personal holding company income. Kenyatta Corp. v. Commissioner, supra at 181.
Designation Test
Petitioner argues that the income in question was not derived from a personal service contract. With respect to the designation test, petitioner makes the following four-fold assertion: First, it is clear from the January 12, 1981 beginning contract date and the testimony of Richard A. Sinervo that this contract was effective during the entire year from 6/30/83 through 6/30/84. Second, nowhere in the contract is the person who is to provide the services either specifically named or described. Third, nowhere in the contract does PMCC have the right to designate who can perform the work under the contract. Fourth, nowhere in the contract does PMCC have the right to prevent Petitioner *363 from substituting one service provider for another. Respondent, on the other hand, argues that there was an oral contract in effect during the tax year in issue which satisfied the designation test set forth in section 543(a)(7). Petitioner proceeded with subcontract work for PMCC in 1981 pursuant to an oral agreement in contemplation that a written subcontract would eventually be executed. However, undisclosed problems prevented petitioner and PMCC from executing a written subcontract until August 1984, several months after the close of the tax year in issue. The record does not reflect whether the written subcontract constitutes a mere formalization of the previously existing oral agreement or differs significantly from that agreement. In that connection, we note the existence of undisclosed problems, the resolution of which presumably shaped the written subcontract, and the relatively extended period of time which elapsed between commencement of the subcontract work and execution of the written subcontract. Under those circumstances, we cannot assume that petitioner and PMCC merely formalized the previously existing oral agreement by executing the written subcontract. Compare *364 Morrison v. Commissioner, T.C. Memo. 1982-613, 44 T.C.M. 1459, 1469 n. 3, 51 P-H Memo T.C. par. 82,613 at 82-2729 n. 3 (where a written agreement which the parties attempted to make retroactive from December 20, 1974, to April 1, 1974, constituted formalization in writing of their existing agreement). Thus, the terms of the written subcontract do not dictate the result of the designation test unless that subcontract applied retroactively. We recognize that, in some circumstances, parties to a contract may bind themselves retroactively. See, e.g., Debreceni v. Outlet Co., 784 F.2d 13, 19 (1st Cir. 1986); American Cyanamid Company v. Ring, 248 Ga. 673, 286 S.E.2d 1, 3 (1982); Sweetman v. Strescon Industries, Inc., 389 A.2d 1319, 1322 (Del. Super. Ct. 1978).Parties typically attempt to do so by creating a legal fiction that the contract existed at an earlier date. Conceptually, the fiction indulged in making a contract retroactively binding is similar to that of the "relation back" doctrine, under which equity requires that a contract be deemed executed as of the moment the contract was offered. [7] However, as Professor Williston notes with respect to that doctrine, which is now largely *365 discredited, "Where the interests of third persons are involved, it is well settled that the fiction of relation back will not be adopted." 1 S. Williston & W. Jaeger, Williston on Contracts § 96 at 355 (3d ed. 1957) (fn. ref. omitted). Similarly, the fiction of retroactivity caused by assigning a date to a contract which antedates its execution cannot be indulged where third persons not party to the contract are involved. Debreceni v. Outlet Co., supra.Indulging that fiction would allow contracting parties to enter retroactively binding contracts which adversely affect the rights of third persons, such as respondent in this case. Thus, contrary to petitioner's assertion regarding retroactive effectiveness, we disregard the written subcontract which was produced at trial and apply the designation test without reference to that subcontract. [8] *366 Although his services were not so valuable and unique as to be irreplaceable, Kenyatta Corp. v. Commissioner, supra at 188, [9] Mr. Sinervo was the only employee of petitioner who performed subcontract work at the Clinton Nuclear Plant during the tax year in issue. Therefore, petitioner must prove that Mr. Sinervo *367 was not designated, by name or by description, in the oral agreement with PMCC, and that no person other than petitioner had the right to designate the individual to perform such work. Sec. 543(a)(7)(A). Petitioner failed to present any evidence, other than the written subcontract, to support its position. To the contrary, the testimony of Mr. Sinervo regarding petitioner's failed attempt to establish a base of employees to perform subcontract work supports the position taken by respondent. Mr. Sinervo testified that petitioner presented the resumes of qualified people to utility companies that had work which needed to be done. Mr. Sinervo further testified that the utility companies either accepted or rejected the people whose resumes had been presented by petitioner. [10] Mr. Sinervo was subject to that same selection process and, therefore, petitioner cannot be found to have designated him to perform the services in question. The utility company which contracted with PMCC for the construction of the Clinton Nuclear Plant designated Mr. Sinervo by accepting him based on his resume. Designation by that utility *368 company cannot be overlooked simply because Mr. Sinervo performed services pursuant to a subcontract which petitioner entered with PMCC. Accordingly, we conclude that petitioner failed to meet its burden of proof with respect to the designation test. 25-Percent Stock Ownership Test
The stock ownership test, set forth in the flush language of section 543(a)(7), is satisfied if Mr. Sinervo owned at least 25 percent of petitioner's outstanding stock at some time during the taxable year in issue. In connection with such test, petitioner argues that Mr. Sinervo owned only 45 of the 500 shares of petitioner's *369 outstanding stock (i.e., 9 percent) and that the remaining 455 shares of petitioner's outstanding stock (i.e., 91 percent) were owned by Mr. and Mrs. Enright. Respondent argues that Mr. and Mrs. Enright were treated as stockholders of petitioner only for purposes of circumventing the personal holding company tax provisions (sections 541 through 547) and, therefore, that Mr. Sinervo actually owned 25 percent or more of petitioner's outstanding stock. We agree with respondent. Petitioner failed to convince us that Mr. and Mrs. Enright in fact owned 91 percent or any other percent of petitioner's outstanding stock. We do not believe that Mr. and Mrs. Enright invested any money in petitioner. To the contrary, we believe that the parties arranged the purported purchase of 91 percent of petitioner's stock by Mr. and Mrs. Enright and the preparation of certain documentation consistent with such a purchase for the purpose of concealing Mr. Sinervo's true ownership of the entire enterprise. Petitioner sought to prove otherwise by eliciting testimony from Mr. and Mrs. Sinervo and Mr. Enright regarding a transaction in which Mr. and Mrs. Enright purportedly purchased 455 shares of petitioner's *370 capital stock for $ 4,550 in cash. All three of those people testified that such a transaction had occurred. However, their testimony lacked sufficient specificity and conviction to satisfy petitioner's burden of proof with respect to the stock ownership issue. Simply stated, we did not believe their testimony on the subject of the purported purchase of stock by Mr. and Mrs. Enright. We are not bound to accept uncontroverted testimony at face value if such testimony seems improbable, unreasonable, or questionable, Lovell and Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir. 1972), affg. per curiam a Memorandum Opinion of this Court, or if the facts in their totality convey a different impression. Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 731 (3d Cir. 1963), affg. a Memorandum Opinion of this Court. Based on the facts of this case, we have concluded that, contrary to the testimony, Mr. and Mrs. Enright were never intended to be bona fide owners of 91 percent of petitioner's stock. Petitioner contends that questionnaires completed by Mr. and Mrs. Enright and their joint affidavit, which were attached to the first supplemental stipulation of facts, bolster Mr. Enright's *371 testimony. However, we closely observed the demeanor and performance of Mr. Enright on the stand when testifying. For the most part, we found him ambivalent and unconvincing; he was not a credible witness. Consequently, his testimony was not regarded to be reliable or trustworthy evidence. Likewise, we do not regard the questionnaires completed by Mr. and Mrs. Enright or their joint affidavit to be reliable or trustworthy evidence bearing on the issue of stock ownership. The Internal Revenue Service compiled a questionnaire regarding Mr. and Mrs. Enright's association with petitioner. Mr. and Mrs. Enright each completed and signed a separate copy of the questionnaire on November 7, 1987. The joint affidavit of Mr. and Mrs. Enright regarding their alleged ownership of 91 percent of petitioner's stock was notarized on November 24, 1988. Petitioner also contends that certain corporate documents, which were received in evidence pursuant to the parties' stipulations, confirm that Mr. and Mrs. Enright owned 91 percent of petitioner's outstanding stock. Petitioner compiled the following list of those documents in its brief: stock certificates, plan to offer stock, corporate minutes, *372 and petitioner's Federal income tax return for the tax year in issue. The record also includes a single page of petitioner's income journal, which reflects receipt of $ 5,000 on February 11, 1981, "from sale of stock." Petitioner issued two stock certificates dated December 19, 1980. One stock certificate designates Mr. Sinervo as the owner of 45 shares of petitioner's capital stock. The other stock certificate designates Mr. and Mrs. Enright as the owners of 455 shares of capital stock. However, the issuance of stock certificates is not determinative of stock ownership for purposes of section 543(a)(7). Sec. 1.543-1(b)(8)(i)(b), Income Tax Regs.; cf. Kenyatta Corp. v. Commissioner, 86 T.C. at 181.In order to be considered owners of 91 percent of petitioner's stock, Mr. and Mrs. Enright must have subscribed to and paid for such stock. The undated document entitled "TAX PAPERS, Plan to Offer Stock," pursuant to which petitioner purportedly offered to sell 500 shares of petitioner's stock at $ 10 per share, provides in pertinent part that: The chairman then informed the meeting that under the Incorporators' agreement Wm. E. and Janet M. Enright and R.A. Sinervo had agreed to purchase *373 common shares of the Corporation pursuant to an offer to issue stock to be made by the Board of Directors at this meeting as follows: Common Stock
Wm. E. & Janet M. Enright
455 Shares Richard A. Sinervo
45 Shares
The mere existence of such a plan does not confirm that the plan was carried out, i.e., that Mr. and Mrs. Enright subscribed to and paid for the stock in question. Similarly, neither Mr. and Mrs. Enright's erratic attendance at stockholders' meetings nor reference to them in the minutes of a stockholders' meeting confirms that they owned any of petitioner's outstanding stock. On a schedule attached to its Federal income tax return for the tax year in issue, petitioner reported that Mr. and Mrs. Enright owned 91 percent of petitioner's voting stock. However, a tax return, even though signed under penalties of perjury, is merely a statement of the taxpayer's claims. The return, standing alone, does not establish the truth of the claims made therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957).Under the circumstances, we view the stock ownership disclosure *374 in petitioner's return with much skepticism. The entry in petitioner's income journal reflecting receipt of $ 5,000 "from sale of stock" does not verify the underlying transaction. Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 832-833 (1980). In Consolidated-Hammer Dry Plate & Film Co. v. Commissioner, 49 T.C. 153, 171 (1967), affd. 409 F.2d 1077 (7th Cir. 1969), we disallowed deduction of real estate taxes evidenced by a bookkeeping entry without proof of further substantiation. Bookkeeping entries "are no more than evidential, being neither indispensable nor conclusive. The decision must rest upon the actual facts." Doyle v. Mitchell Brothers Co., 247 U.S. 179, 187 (1918).Moreover, the particular bookkeeping entry in question neither corresponds to the amount Mr. and Mrs. Enright purportedly paid for petitioner's stock (i.e., $ 4,550) nor identifies the payor or payors of the $ 5,000. We recognize that the documents described in the immediately preceding paragraphs, if considered alone, might be sufficient to support the conclusion that Mr. and Mrs. Enright were the bona fide owners of 91 percent of petitioner's outstanding stock. However, such self-serving *375 documentation all prepared under the direction and control of petitioner or its representatives, in one capacity or another, collapses under the weight of the objective facts. Mr. Sinervo, not Mr. and Mrs. Enright, exercised effective control over and complete domination of petitioner. Apparently, Mr. and Mrs. Enright only attended stockholders' meetings when it was convenient to do so. The extent of Mr. and Mrs. Enright's involvement in petitioner's affairs was otherwise limited to occasional informal discussions which Mr. Enright had with Mr. Sinervo. Mr. and Mrs. Enright never received any dividend or other return on their purported investment in petitioner's stock. Petitioner has not engaged in any business activities for several years and it holds no significant assets. Although Mr. Enright testified that he assumed that the current value of petitioner's stock was "next to nothing," no affirmative action has been taken by him or his wife to increase the value of such stock or close out their purported investment therein. A realistic examination of those facts together with all other pertinent facts in the record leads us to the conclusion that Mr. and Mrs. Enright are not *376 now, nor were they ever, bona fide owners of any of petitioner's outstanding stock. To the contrary, we believe that Mr. and Mrs. Enright agreed to participate in a facade, which included their alleged ownership of 91 percent of petitioner's stock, to conceal Mr. Sinervo's true ownership of the entire enterprise. Our assessment of the credibility of the witnesses who testified on the subject of stock ownership and the reliability of the relevant documentation does not call for a different conclusion. Based on the results of the designation test and the 25-percent stock ownership test, we conclude that during the tax year in issue petitioner derived income from PMCC pursuant to a personal service contract within the meaning of section 543(a)(7). Therefore, such income constituted personal holding company income. [11] *377 Petitioner neither argued nor attempted to prove that its personal holding company income was less than 60 percent of its adjusted ordinary gross income. Accordingly, we hold that petitioner was a personal holding company during the year in issue and is, therefore, subject to the personal holding company tax imposed by section 541. "Per Diem Paid" Deduction
Petitioner deducted $ 11,100 as "per diem paid" to Mr. Sinervo during the tax year in issue. Respondent disallowed that deduction and provided the following explanation for doing so in his notice of deficiency: "It has not been established that the amounts paid to Richard Sinervo and deducted as per diem on your tax return, were ordinary and necessary business expenses." In the second supplemental stipulation of facts, petitioner conceded the "per diem paid" deduction. For cause, however, we granted petitioner's motion to withdraw that stipulated concession and afforded petitioner an opportunity to prove the deductibility of payments in the amount of $ 11,100. Petitioner argues that the $ 11,100 constituted a deductible per diem allowance paid to Mr. Sinervo for meal and lodging expenses incurred by him while away from home in petitioner's employ. In that connection, petitioner asserts that Mr. and Mrs. Sinervo owned a residence in Marquette, Michigan, from which they were away while Mr. *378 Sinervo was on temporary assignment at the Clinton Nuclear Plant during the tax year in issue. Respondent argues that Marquette, Michigan, was not Mr. and Mrs. Sinervo's home for tax purposes and, therefore, that they were not away from home while Mr. Sinervo worked at the Clinton Nuclear Plant. Respondent further argues that payment of per diem in the amount of $ 11,100 to Mr. Sinervo did not constitute an ordinary and necessary business expense of petitioner. Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." Specific meaning attaches to the terms ordinary and necessary as used in the context of that section. Ordinary means "normal, usual, or customary," Deputy v. du Pont, 308 U.S. 488, 495 (1940), and, therefore, expenses are not ordinary unless they are "of the type which are common to, or frequently occur in, the type of business in which [the taxpayer] is engaged." Frederick Steel Co. v. Commissioner, 42 T.C. 13, 25 (1964), revd. on other grounds 375 F.2d 351 (6th Cir. 1967). See Brizell v. Commissioner, 93 T.C. 151, 157 (1989).Necessary means "appropriate and helpful" for "the development *379 of the taxpayer's business." Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Brizell v. Commissioner, supra at 160. Whether expenditures are for ordinary and necessary business expenses is a question of fact, Commissioner v. Heininger, 320 U.S. 467, 473-475 (1943), with respect to which petitioner bears the burden of proof. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Mr. and Mrs. Sinervo both testified that they graduated from high school in Marquette, Michigan. Mr. and Mrs. Sinervo also testified that they owned a house in Marquette, Michigan, which they considered to be their "tax home." Nevertheless, we reject petitioner's away from home [12] *380 argument because there is no evidence indicating that Mr. and Mrs. Sinervo lived in Marquette, Michigan, at anytime after Mr. Sinervo joined the Navy in 1959. Mr. and Mrs. Sinervo moved each time Mr. Sinervo changed jobs and they maintained their personal residence at or near the place of his employment. While Mr. Sinervo worked at the Clinton Nuclear Plant, Mr. and Mrs. Sinervo lived in rental houses in Mahomet, Illinois. Petitioner neither advanced other arguments regarding the deductibility of the $ 11,100 designated as per diem nor demonstrated that payments of that amount to Mr. Sinervo were in any way related to the conduct of petitioner's business. Thus, petitioner has failed to prove that the payments to Mr. Sinervo, which were designated as per diem, constituted an ordinary and necessary business expense. Accordingly, no deduction is allowed with respect to those payments. Additions to Tax
Section 6653(a)
Respondent determined that petitioner was liable for *381 additions to tax under sections 6653(a)(1) and 6653(a)(2). Section 6653(a)(1) provides an addition to tax if any part of an underpayment of tax is due to negligence or disregard of the rules and regulations. Section 6653(a)(2) provides an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. For purposes of section 6653(a), negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner bears the burden of proving that its underpayment of tax was not due to negligence. Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). Petitioner argues that it was not negligent in the preparation of its return for the year in issue or the conduct of its business affairs during that year because, among other things, it (1) sought and followed regular professional tax advice; (2) strictly observed corporate formalities, including the maintenance of a separate bank account to avoid the commingling of its assets with those of Mr. and Mrs. Sinervo; *382 and (3) employed recognized accounting methods in keeping income and disbursement journals. The alleged observance of corporate formalities and employment of recognized accounting methods by petitioner bear upon the conduct of petitioner's business affairs generally but not upon the handling of the specific income tax matters which we are concerned with in this case. Therefore, in resolving the negligence additions issue, we focus upon petitioner's assertion regarding the exculpatory effect of its alleged reliance upon the tax advice of a professional. As a general rule, the taxpayer has a duty to file accurate returns which cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974).An exception to that rule exists where the taxpayer relies upon the advice of a competent and experienced accountant in the preparation of the return. Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968).However, reliance upon expert advice does not necessarily insulate the taxpayer from liability for negligence additions to tax. Enoch v. Commissioner, supra at 802.The taxpayer must establish that the accountant was supplied with all necessary information *383 and that the incorrect return resulted from the accountant's mistakes. Pessin v. Commissioner, 59 T.C. 473, 489 (1972).Petitioner failed to make such a showing. Petitioner sought the advice of Mr. Sinervo's brother, who is an accountant, in connection with various income tax matters and he prepared petitioner's return for the year in issue. However, the record does not reveal the nature or extent of information which petitioner provided to Mr. Sinervo's brother for his use in preparing petitioner's income tax return. A similar void exists with respect to where responsibility lies for the incorrect reporting of particular items on that return. Petitioner simply failed to introduce sufficient specific information to carry its burden of proof regarding its alleged reliance on the advice of Mr. Sinervo's brother. Petitioner further argues that negligence additions should not be assessed on the underpayment resulting from disallowance of deductions for depreciation and vehicle expense, in the amount of $ 5,188.18 and $ 2,369.09, respectively. Petitioner made a similar argument with respect to an investment tax credit in the amount of $ 586.16. Petitioner asserts that it conceded *384 those deductions and that credit before trial "to save court time for more important issues." Petitioner also asserts that such concessions were made "with the understanding that no negligence penalties would result and that NOL carryforwards and carrybacks could be used to shelter any extra income from lost deductions." Petitioner's concessions of the deductions for depreciation and vehicle expense and the investment tax credit do not relieve petitioner from its burden of proof with respect to the negligence additions. Nothing in the record supports the assertion that petitioner made such concessions "with the understanding that no negligence penalties would result." Therefore, the arguments which petitioner made in connection with such concessions are without merit. In sum, we find that petitioner has failed to prove that any part of the underpayment for the year in issue was not due to negligence. Accordingly, we uphold respondent's determination regarding additions to tax under sections 6653(a)(1) and 6653(a)(2). Section 6661
Section 6661 provides for an addition to tax in an amount equal to 25 percent of any underpayment attributable to a substantial understatement of income *385 tax. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). With respect to a personal holding company (as defined in section 542), an understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1) and (2). For the year in issue, respondent determined that petitioner substantially understated its income tax by $ 19,815.08 and imposed an addition to tax of $ 4,953.77 under section 6661(a). Petitioner has the burden of proof on the issue of its liability for the section 6661 substantial understatement addition. Rule 142(a). Petitioner presented neither proof nor argument relating specifically to that determination. [13] Accordingly, we uphold respondent's determination regarding the addition to tax under sections 6661. To reflect the *386 foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest due on $ 19,815.08↩
2. Petitioner raised an issue of whether it is allowed a net operating loss deduction in the amount of $ 11,020.90 under section 172(a), based on a carryforward from the tax year ended June 30, 1983. However, we need not decide that issue because the parties reached a settlement with respect thereto pursuant to the sixth supplemental stipulation of facts, filed May 30, 1990. Petitioner also raised an issue of whether it is allowed a net operating loss deduction of an unspecified amount, based on a carryback from the tax year ended June 30, 1985. A case involving petitioner's tax years ended June 30, 1985, and June 30, 1986 (i.e., docket No. 31252-88), has been assigned to Judge Whitaker↩ for trial or other disposition. Thus, petitioner will have an opportunity to prove that it incurred a net operating loss for the tax year ended June 30, 1985. After a decision is entered in docket No. 31252-88, the issue of whether petitioner is allowed a net operating loss deduction based on a carryback from its tax year ended June 30, 1985, can be resolved in the Rule 155 computation.
3. At trial, we granted petitioner's oral motion to withdraw paragraphs 28 and 29 of the second supplemental stipulation of facts.↩
4. Mr. Sinervo testified that "whenever something changed, we re-signed a contract." Absent from the record, however, is any explanation regarding the whereabouts or content of a written subcontract or "Compensation Package" which pertains specifically to work done at the Clinton Nuclear Plant during the tax year in issue. Presumably, a subcontract and/or "Compensation Package" for work done on that job, if ever executed, would not have been executed until sometime after execution of the subcontract and "Compensation Package" which were produced at trial.↩
5. The provision on personal service contracts was enacted to close the so-called "incorporated talent" loophole. Otherwise, individuals receiving large amounts of personal service income could avoid the effect of the progressive income tax rates by arranging for wholly owned corporations to contract for, and receive compensation for, their services. S. Rept. 1242, 75th Cong., 1st Sess. (1937), 1937-2 C.B. 609, 613; Kurt Frings Agency, Inc. v. Commissioner, 42 T.C. 472, 477 (1964), affd. per curiam 351 F.2d 951↩ (9th Cir. 1965).
6. It is not clear whether petitioner received the entire amount of $ 108,311.51 from PMCC in connection with subcontracting work performed by Mr. Sinervo. The possibility exists that PMCC paid petitioner some portion of that amount in connection with the performance of other services, such as tax-related services performed primarily by Mrs. Sinervo or services performed with respect to the gathering of resumes and the placement of workers. However, in the absence of proof or argument to the contrary, we treat the entire amount petitioner received from PMCC as having been received in connection with subcontract work performed by Mr. Sinervo.↩
7. "[Relation back] is a fiction which can not be applied where the demands of justice do not imperatively require its application." Pitcairn v. American Refrigerator Transit Co., 101 F.2d 929, 934 (8th Cir. 1939), cert. denied 308 U.S. 566↩ (1939).
8. Although he is not designated by name, the written subcontract does not foreclose the possibility that Mr. Sinervo was designated by description as the person to perform services thereunder. The written subcontract provides in pertinent part as follows: 2. DESCRIPTION OF SECOND PARTY'S DUTIES * * * PMC Corp. has entered into this agreement based on a given consultants resume, experience and potential and that individual shall put forth 100% effort in return for the subject compensation at all times, without regards to assignments or changes to those assignments. * * * However, consideration of the terms of the written subcontract is unwarranted since we decline to treat that subcontract as retroactively effective for tax purposes. Moreover, it is not entirely clear from the record whether the written subcontract which was produced at trial even pertains to the work which was done by Mr. Sinervo at the Clinton Nuclear Plant during the tax year in issue. See n. 4, supra↩.
9. See Rev. Rul. 75-67, 1975-1 C.B. 169; Rev. Rul. 75-249, 1975-1 C.B. 171↩.
10. According to Mr. Sinervo, each utility company selected people to do contract work which was arranged through general contractors such as PMCC. Although not every aspect of Mr. Sinervo's testimony was completely credible, we accord significant weight to his testimony regarding the selection process which he described, since that testimony is not self-serving. We acknowledge, however, that such a selection process seems unusual for work performed under a construction contract by a general contractor and a subcontractor, both of whom would normally be expected to do their own hiring.↩
11. Respondent determined that petitioner had interest income in the amount of $ 3,253.74 which also constituted personal holding company income. See sec. 543(a)(1)↩. However, that determination is not in issue.
12. In advancing their respective positions on brief, both parties apparently rely upon the "away from home" rules developed under section 162(a)(2)↩, which apply to employees seeking to deduct travel expenses incurred in connection with the performance of services as employees. However, whether petitioner is allowed to deduct the amount designated as per diem constitutes an issue separate and distinct from whether Mr. Sinervo is allowed to deduct expenses for meals and lodging under the "away from home" rules. The former issue is the issue which must be decided in this case. The latter issue, if not resolved in the meantime, will be decided in connection with docket No. 4553-89, a related case in which Mr. and Mrs. Sinervo are the petitioners.
13. On brief, petitioner argued against the imposition of additions without differentiating between the additions to tax for negligence and the substantial understatement addition. Petitioner simply characterized all of the additions to tax as "negligence penalties." None of the arguments advanced by petitioner pertain to the substantial understatement addition.↩