DUANE F. JOHNSON AND JOANN M. JOHNSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 1772-91
United States Tax Court
T.C. Memo 1992-288; 1992 Tax Ct. Memo LEXIS 306; 63 T.C.M. (CCH) 3034; May 18, 1992, Filed *306 Decision will be entered under Rule 155. Kevin D. Allen, for petitioners. William R. Davis, for respondent. PATE
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 183. [1]
Respondent determined the following deficiencies in and additions to petitioners' 1986 and 1987 Federal income taxes and increased interest on substantial underpayment of such taxes: [2]
*307 1986
1987
Deficiency
$ 4,770
$ 4,402
Additions to Tax
Sec. 6653(a)(1)(A)
239
220
Sec. 6653(a)(1)(B)
[1]
[1]
Increased interest
Sec. 6621(c)
[2]
[2]
The issues for our decision are: (1) Whether petitioners engaged in their motor home leasing activity for profit, and, therefore, are entitled to deduct losses incurred therefrom; (2) whether petitioners are entitled to deduct $ 92 in legal fees in 1987; (3) whether petitioners are liable for additions to tax for negligence; and (4) whether petitioners are liable for an increased rate of interest on any substantial underpayment attributable to a tax motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts, Supplemental Stipulation of Facts, and attached *308 exhibits are incorporated herein by this reference. Duane F. Johnson (hereinafter petitioner) is a machinist. For the past 3 years he has been self employed. Before that, he was employed by Sunstrand Aviation Corporation for approximately 25 years, first, as a machinist, later, as a supervisor. Joann M. Johnson is employed at Regis University as a secretary. Prior thereto, she worked for 7 years as a credit investigator at Bank Western in Denver, Colorado. Mr. and Mrs. Johnson (hereinafter petitioners) have owned motor homes since 1969. In 1984, they purchased from Nolan's RV Center, Inc., Denver, Colorado (hereinafter Nolan's), a 1977 23-foot Roll-A-Long motor home (hereinafter 1977 motor home) for $ 16,000. On September 21, 1985, petitioners traded in their 1977 motor home on a new 1986 Winnebago Model 26RU motor home (hereinafter 1986 motor home). The 1986 motor home was a self-propelled, self-contained 26-foot mini on a Ford chassis. It was winterized and equipped with a cabover, a roof air conditioner, and a generator. It contained 3 beds, a dinette, a bathroom with a shower, a galley with a stove and a 3-way refrigerator. The purchase price was $ 40,405. Petitioners *309 received a credit for their trade-in of $ 11,000, and financed the balance with a note which, with interest, was payable for 10 years at $ 473 per month. As additional consideration for their trade-in, the first 6 months of payments on this note were waived. Prior to purchasing the 1986 motor home, petitioners had seen advertisements for Nolan's leaseback program. Upon petitioners' inquiry, Nolan's salesman explained that if they leased their motor home under the program they could: (1) Receive $ 30 for each day their motor home was rented, (2) depreciate 100 percent of the purchase price over 3 years, (3) expect their motor home to be rented for a period of 90 to 120 days each year, and (4) expect their motor home to appreciate in value. Nolan's gave petitioners a booklet describing the leaseback program. The representations in the booklet were based on estimates made by Jerry Nolan, president of Nolan's. Included therein is the following example of the projected tax savings and cash flow to be realized by a typical lessor: 1983 Jamboree 23'
75% Loan 10 Years
with dual air cond.
Down Payment $ 8,448, plus
Selling price $ 33,795
sales tax
Loan Amount $ 25,347
Monthly Payment $ 405.05
TAX YEAR
1983
1984
1985
Rental Income
$  1,000 $  3,000 $  3,000 TAX DEDUCTIBLE EXPENSE:
Interest
$  1,246 $  3,590 $  3,405 Depreciation
8,195 12,457 12,129 Insurance
246 738 738 License & Tax
650 550 470 Maintenance
100 600 600 Storage
30 150 150 Sales Tax (4.1%)
$  1,385 $    -0- $    -0- TOTAL DEDUCTIONS
$ 11,852  $ 18,085 $ 17,492 TAX BENEFIT (40%)
$  5,310 $  8,012 $  7,836 TAX CREDITS
$  2,230 $    -0- $    -0- TOTAL TAX SAVINGS
$  7,540 $  8,012 $  7,836 CUMULATIVE TAX SAVINGS
$  7,540 $ 15,552 $ 23,388 CASH FLOW ANALYSIS *
1983
1984
1985
Rental Income
$  1,000 $  3,000 $  3,000 Tax Savings
7,540 8,012 7,836 Payments
(1,620)
(4,860)
(4,860)
Expenses
(1,026)
(1,838)
(1,958)
TOTAL CASH FLOW
$  5,894 $  5,314 $  4,018 CUMULATIVE CASH FLOW
$  5,894 $ 11,208 $ 15,226 *310 In addition, the booklet stated that there was a possibility of profit to the prospective lessor, but did not contain any financial projections or representations showing how that profit could be realized. However, the booklet did state that "used units should stay in great demand". Prior to purchasing and leasing back their 1986 motor home, petitioners did not consult with anyone other than Nolan's salesman regarding the profit they could expect or the validity of the projections in the booklet. They did not even consult with their accountant, a person who had prepared their income tax returns in prior years. On September 24, 1985, petitioners entered into an "Exclusive Lease Agreement" (hereinafter the lease) with Nolan's whereby they leased their newly purchased 1986 motor home to Nolan's for a period of 23 months. The lease provided *311 that petitioners would receive rent of $ 30 per day for each day their 1986 motor home was rented to the general public. [3] Under the lease, Nolan's promised to use its best efforts to rent petitioners' 1986 motor home and to perform minor maintenance, such as oil changes, lubrication, alignments, minor adjustments and cleaning. Petitioners were responsible for the "cost of maintenance to maintain the vehicle in top condition". In addition, petitioners were liable for insurance costs of $ 152 per month (later raised to $ 170 per month). Under the lease, petitioners also were granted the right to rent any of the motor homes held by Nolan's (including their own) for Nolan's cost, plus 17-percent. Nolan's sent petitioners monthly statements reporting the income collected and expenses incurred under the lease. If rental income exceeded the monthly *312 payments owed Nolan's, petitioners received a check. If not, petitioners had to pay the balance due. During 1986, petitioners' motor home was rented for 133 days. Nolan's later altered the terms of the leaseback program relieving lessors of the insurance and maintenance payments. These changes went into effect for lease agreements executed after 1986. However, petitioners did not execute a new lease after the expiration of their 1985 lease. Instead, they took possession of their 1986 motor home on January 1, 1988. It had been driven over 45,000 miles in 2 rental seasons. Petitioners provided their accountant with the monthly statements sent them by Nolan's. On their 1986 and 1987 Federal income tax returns, they reported the following amounts as motor home rental income and deductions: 1986
1987
Rental Income
$  3,990 $  3,390 Depreciation
(15,655)
(15,243)
Rental Expenses
(6,795)
(6,689)
Total Losses
$ 18,460 $ 18,542 Deductible Amount
$18,460 $ 18,433 In the notice of deficiency, respondent disallowed the losses claimed by petitioners. OPINION Motor Home Lease
In general, a taxpayer must show that he or she entered into an activity *313 or continued the activity with an objective of making a profit in order to deduct losses realized from such activity. Sec. 1.183-2(a), Income Tax Regs. If the taxpayer engaged in the activity without a profit objective, deductions attributable thereto are allowed, but (with minor exceptions) only to the extent of the income derived from the activity. Sec. 183(b)(1) and (2). The test under section 183 is whether the taxpayer engaged in the activity with an actual and honest objective of making a profit. Beck v. Commissioner, 85 T.C. 557, 569 (1985); Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Dreicer v. Commissioner, 78 T.C. 642, 644-646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The term "profit" in the context of section 183 means economic profit independent of tax savings. Soriano v. Commissioner, 90 T.C. 44, 54 (1988); Herrick v. Commissioner, 85 T.C. 237 (1985); Surloff v. Commissioner, 81 T.C. 210 (1983). *314 Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all relevant facts and circumstances. Hulter v. Commissioner, 91 T.C. 371, 392-393 (1988); Golanty v. Commissioner, supra at 426. The burden of proving such objective is on petitioner. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In determining the taxpayer's objective, greater weight is given to objective facts than to a taxpayer's statement of intent. Beck v. Commissioner, 85 T.C. at 569-570; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which normally should be considered in determining whether an activity is engaged in with the requisite profit objective. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets *315 used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling. Rather, it is an evaluation of all the facts and circumstances in the case taken as a whole which is determinative. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Benz v. Commissioner, 63 T.C. 375, 382 (1974); sec. 1.183-2(b), Income Tax Regs.
Applying these criteria to petitioners' motor home lease, we find that petitioners did not engage in such activity with an objective of realizing a profit therefrom. Although we base our decision on all of the facts, there are several factors which we found most persuasive. First, petitioners relied solely on Nolan's representations when considering whether to enter the leaseback program. They knew that Nolan's stood to profit *316 handsomely if they purchased a motor home and then entered into the leaseback program. Yet, they failed to obtain a detached and realistic evaluation of the financial consequences thereof. Failure to seek such advice indicates that they were not particularly interested in ascertaining whether they could realize an overall profit on the transaction. Further, the representations made in Nolan's booklet did not project any "profit" independent of tax savings. The cash flow analysis included in the booklet is couched in terms of "tax deductible expense", "tax benefit", "tax credit", and "total tax savings". In fact, Nolan's salesman described the program to petitioners as a "good chance for a tax shelter". Therefore, if petitioners carefully read the materials generated by Nolan's, such materials would not have led petitioners to believe they could realize a profit without taking into account the tax benefits projected to be generated thereby. Petitioners contend, however, that because their 1986 motor home was winterized, they expected rental income in excess of that projected in the booklet; they expected that their 1986 motor home would be rented a full 6 months per year. Even *317 if we assume that their expectations could be realized, however, they still would have received a total of only $ 5,400 in rental income per year. In contrast, petitioners were obligated to pay (at a minimum) $ 152 per month for insurance and $ 473 per month on the note, payments totaling $ 7,500 a year. Therefore, even assuming the best of circumstances, petitioners had almost no chance of realizing a profit. Nevertheless, petitioners argue that, even if the rental income generated annually did not cover their out-of-pocket costs, they would still realize a profit on its resale because their 1986 motor home would appreciate in value. However, Nolan's representations as to the resale value are vague and petitioners did not attempt to quantify the broad statements made in the booklet or seek out any independent verification of the opinions expressed therein. Nor did petitioners present any credible evidence at trial to support their contention that their motor home would appreciate. Finally, we note that petitioners' own experience would have led them to an opposite conclusion. When they traded in their 1984 motor home, they received less than they had paid. In addition, they *318 had owned other motor homes before, yet, failed to present testimony of even one instance within their personal experience where they would have been able to sell a motor home for more than they paid for it. There are some factors which favor petitioners. They leased back their motor home to an existing dealer, one who was in a position to actively promote the rental of that motor home. Moreover, Nolan's had the staff to properly maintain the motor home and to keep proper accounting records. However, the leaseback was structured around a daily rate which made it almost impossible for a lessor to realize a profit on the transaction. Nolan's as much as said so in the projections it distributed to prospective customers. In addition, we are convinced that petitioners realized that this was the case when they entered into the transaction. They were experienced owners of motor homes and, therefore, capable of evaluating the chances of profit under the lease. We conclude that petitioners entered into the transaction, not in the belief that they would profit thereby, but rather, in an attempt to reduce the amount of monthly cash they would have to generate because the payments required *319 by the note would be offset by a small amount of rental income and a relatively large amount of tax benefits. Consequently, we find that petitioners did not enter their motor home leasing activity with an actual and honest objective of making a profit. Accordingly, they are entitled to deduct their expenses only in an amount equal to the amount of the income they realized from this activity. Legal Fees
Respondent determined that petitioners are not entitled to deduct the $ 92 in legal fees shown on their Schedule E for 1987. At trial, petitioners did not offer any evidence to refute respondent's determination. In general, respondent's determinations are presumed correct, and the burden of proving otherwise rests with petitioner. Welch v. Helvering, 290 U.S. 111 (1933). Because petitioners did not present any evidence on this issue, they obviously did not carry their burden of proof. Accordingly, we sustain respondent's determination. Negligence
In the notice of deficiency, respondent determined that petitioners were liable for the additions to tax for negligence. Section 6653(a)(1)(A) provides that, if any portion of an underpayment of tax *320 is due to negligence or intentional disregard of rules or regulations, an amount equal to 5 percent of the underpayment is added to the tax. Section 6653(a)(1)(B) provides for an addition to tax equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Respondent's determination as to negligence is prima facie correct, and the burden is upon the taxpayer to prove the addition erroneous. Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). Prior to entering the program, petitioners relied solely upon the representations of Nolan's that they could claim the tax benefits reflected in the booklet. Their failure to look beyond the booklet supplied by Nolan's is contrary to what a reasonably prudent person would have done. LaVerne v. Commissioner, 94 T.C. 637, 652 (1990), affd. 956 F.2d 274 (9th Cir. 1992), affd. sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). *321 Petitioners argue, however, that because Nolan's consulted with an accountant when it prepared the program's booklet, their reliance on the booklet was prudent. We are unpersuaded. The accountant petitioners purport to have relied on was employed by Nolan's, the party from whom petitioners purchased their motor home. In Chase v. Commissioner, T.C. Memo. 1990-615, we held that, when a taxpayer relied solely upon the advice of a tax return preparer from whom they purchased their trust packages, they were liable for the negligence addition to tax. Similarly, we find that petitioners' exclusive reliance on an interested party's representations was imprudent. Lastly, petitioners contend that they should not be subject to the additions to tax for negligence because adequate records were kept by Nolan's, and they turned Nolan's reports over to their accountant for preparation of their returns. However, petitioners' duty to act prudently goes further than merely turning over records to their accountant. Good faith reliance on the advice of counsel or a qualified accountant can, under certain circumstances, be a defense to the addition to tax for negligence. Pessin v. Commissioner, 59 T.C. 473, 488-489 (1972); *322 Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). The Courts have absolved taxpayers from additions to tax for negligence in cases where the taxpayer: (1) Consulted a fully qualified, independent, accountant; (2) fully disclosed the facts to him; and (3) then relied on his advice in good faith. Leonhart v. Commissioner, 414 F.2d 749 (4th Cir. 1969), affg. T.C. Memo. 1968-98. However, this record gives us almost no information regarding the qualifications of petitioners' accountant to evaluate the transaction, whether petitioners turned over the promotional materials to their accountant, and what advice their accountant may have given them with respect to the deductibility of losses from their leaseback. Absent this information, we hold that petitioners have not carried their burden of proving that they were not negligent. Increased Interest
Respondent determined that petitioners are liable for increased interest pursuant to section 6621(c). Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (an underpayment of more than $ *323 1,000) attributable to a "tax motivated transaction". The increased rate applies to interest accrued after December 31, 1984. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Certain transactions are deemed to be "tax motivated" by section 6621(c)(3). In addition, the regulations specify additional transactions that are deemed tax motivated, including transactions whose deductions were disallowed under section 183 because the activity was not engaged in for profit. Sec. 6621(c)(3)(B); Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. without published opinion sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); sec. 301.6621-2T, Q-4 and A-4(1), Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). *324 We have concluded that petitioners' motor home leasing activity was not entered into for profit. Thus, such activity is among those that are deemed tax motivated. Accordingly, we hold that petitioners are liable for the increased interest provided for by section 6621(c). To reflect the foregoing -- Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners also challenged respondent's determination for 1988. However, on brief, respondent conceded that there was no deficiency in petitioners' 1988 Federal income tax, nor were there any additions to tax for that year.↩
1. 50 percent of the interest that is computed on the portion of the underpayment which is attributable to negligence. ↩
2. 120 percent of the interest due on any substantial underpayment attributable to a tax motivated transaction.↩
*. Cash flow analysis does not take into consideration down payment or income that might be received in off-season rental. Expenses are based on estimates from our rental experience.↩
3. Generally, Nolan's rented out the 1986 motor home for $ 60 per day plus 8 to 12 cents per mile. Petitioner was not aware that the lessees were being charged mileage.↩