T.C. Memo. 1996-78


UNITED STATES TAX COURT


MASCHMEYER'S NURSERY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22315-94.            Filed February 26, 1996.


        R determined that deductions claimed by P for
annual rental payments made to P's sole shareholder
under a real property lease exceeded the fair rental
value of the property, and disallowed depreciation
deductions claimed by P for improvements made to a
residence used by P's sole shareholder. <u>Held</u>: Rental
payments were not deductible to the extent that they
exceeded the amount allowed by R. <u>Held</u>, <u>further</u>, the
residence occupied by P's sole shareholder was used in
P's business for purposes of sec. 167, I.R.C., and
hence, depreciation may be deducted by P.


<u>F. Pen Cosby</u>, for petitioner.

<u>Ronald T. Jordan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  This case is before the Court on the petition of Maschmeyer's Nursery, Inc., to redetermine deficiencies and accuracy-related penalties determined by respondent as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1989 | $47,284 | $9,457 |
| 1990 | 47,762 | 9,552 |
| 1991 | 43,777 | 8,755 |

The issues for decision are:  (1) Whether annual payments made by petitioner to its sole shareholder and his wife under a lease of undeveloped land are deductible by petitioner as rent to the extent that they exceed $65,000; (2) whether improvements to a residence located on petitioner's premises and used by its sole shareholder qualify as property used in a trade or business for which depreciation deductions claimed by petitioner are allowable; and (3) whether petitioner is liable for accuracy-related penalties under sections 6662(a) and (b)(1).[1]

FINDINGS OF FACT

Some of the facts have been stipulated, and are so found. The stipulations and attached exhibits are incorporated herein by this reference.  Petitioner is an Indiana corporation with its

---

[1] All section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedures.

principal office located in Whiteland, Indiana. Petitioner grows nursery stock for sale at wholesale and provides landscaping services. During the taxable years at issue petitioner's sole shareholder was James R. Maschmeyer (Maschmeyer). He became sole shareholder in 1986 after petitioner redeemed the stock held by his parents.

Rent Deductions

Petitioner owns a parcel of 265 acres. The scale of petitioner's operations is approximately twice this area, however, because petitioner leases additional contiguous land from Maschmeyer and his wife. The Maschmeyers acquired the land for petitioner's use as it became available over several years. This arrangement was designed to avoid increasing the corporation's long-term debt, which would have jeopardized its ability to borrow for working capital at favorable rates. Tract B, comprising 126.5 acres situated on the southern border of petitioner's own land, was acquired by the Maschmeyers in two parts: 37-1/2 acres in August 1984 at a price of $52,500 ($1,400 per acre) and 89 acres in December 1986 at a price of $180,000 ($2,022.50 per acre). Tract A, comprising 123.5 acres situated on the northern border of petitioner's own land, was acquired in January 1989 through an estate sale for $228,449 ($1,850 per acre). Thus, the total investment by the Maschmeyers amounted to approximately $461,000. In January 1989 they entered into a 5-year lease with petitioner for both tracts at an annual rental

of $140,000 ($560 per acre).  On its corporate tax returns, Form 1120, for the years at issue petitioner claimed a deduction for this amount as an ordinary and necessary business expense.  On their individual tax returns for these years, the Maschmeyers claimed mortgage interest deductions in connection with the lease in the amounts of $25,031, $19,170, and $17,550.

The two tracts are essentially identical in soil quality, grade, and drainage and have no improvements besides drainage tile.  About 30 percent of tract A is covered in woods and consequently not used for cultivation.  During the years at issue, the tracts had access to some utilities.  Sewer, electricity, and telephone service were available to tract A. Only electricity and telephone service were available to tract B. Neither had access to municipal water.  Both tracts were zoned for residential use.  The tracts are located about 15 to 20 miles from downtown Indianapolis in a neighborhood consisting primarily of agricultural land intermixed with single-family homes.  During the years at issue demand for undeveloped land in the neighborhood was stable.  But the neighborhood lies within a narrow corridor formed by two major arteries to the Indianapolis metropolitan area, I-65 and U.S. Highway 31, along which considerable residential and commercial development was occurring.  The residential growth extending southward and northward from the nearby cities of Greenwood and Franklin made it likely that vacant land in this neighborhood would be subject

to increasing demand from speculators and developers in the near future.

In determining a rental rate for the tracts of $140,000, Maschmeyer did not consult a real estate appraiser. He relied instead upon the expertise that he had developed over nearly 20 years of full-time work in the nursery business and upon the advice of a certified public accountant (C.P.A.), Daniel H. Wagner (Wagner). Wagner had at least 10 years of experience in tax accounting prior to the years at issue and personally prepared petitioner's tax returns for each year beginning in 1985. Maschmeyer and Wagner were not aware of any comparable leases in the Indianapolis area, so they constructed what they believed to be a fair and reasonable rent from, inter alia, information they had as to prevailing cash rents for lower value crops, productivity of nursery operations, petitioner's projected cash-flow, the Maschmeyers' borrowing costs for purchase of the tracts, loss of topsoil through harvesting practices, the economies expected to result from the use of contiguous acreage, and the prevailing yield on financial assets. In her notice of deficiency respondent determined that only $23,000 of the annual rental payments was deductible as an ordinary and necessary business expense. Subsequently respondent revised her determination to $65,000 on the basis of a professional real estate appraisal.

Depreciation Deductions

A house is located on petitioner's property.  The Maschmeyers moved into this house in 1977 to replace the previous tenant, who had lived there since about 1965 while employed as petitioner's foreman.  Maschmeyer continued to occupy the house throughout the years at issue.  For the convenience of his wife and children, however, in 1989 he purchased a home in Indianapolis, where his wife and children lived during the week.  Maschmeyer assumed the foreman's duties, securing the premises and equipment, overseeing the gang of migrant workers housed in mobile homes on the premises, and supervising pickup of trees outside business hours during harvest seasons.

After Maschmeyer became sole shareholder, petitioner made certain improvements to the house that Maschmeyer occupied.  In 1986 a swimming pool was installed at a cost of $35,011.  In 1987 a pool house and other amenities were added to the house at a cost of $32,684.  In 1988 and 1989 improvements were made to the garage and a master bedroom was added to the house at a cost of $94,295.  Additional redecorating and wallpapering were done at a cost of $4,482 in 1990.  Petitioner claimed depreciation deductions for the aforesaid improvements in 1989, 1990, and 1991 in the amounts of $4,212, $5,038, and $5,038, respectively.  Respondent disallowed these deductions in her notice of deficiency.

OPINION

1. Rent Deductions

Section 162 provides for the deduction of all ordinary and necessary business expenses, including rentals required to be paid as a condition for the use of property. Sec. 162(a)(3). Although the statutory standard does not expressly limit the deduction to a reasonable amount, where the lessor and lessee are closely related and there is no arm's-length dealing between them, an inquiry into what constitutes a reasonable rental is necessary to determine whether the sums paid exceed what the lessee would have been required to pay in an arm's-length transaction with an unrelated party. Potter Elec. Signal & Manufacturing. Co. v. Commissioner, 286 F.2d 200, 202-203 (8th Cir. 1961), affg. T.C. Memo. 1960-030; Feldman v. Commissioner, 84 T.C. 1, 6-8 (1985); Davis v. Commissioner, 26 T.C. 49, 56 (1956); Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952). Since Maschmeyer is petitioner's sole owner and it is undisputed that he played a major role in determining the rental, we look beyond the agreement for evidence of the fair rental value of the subject property.

Each party presented the opinion of a professional real estate appraiser to establish fair rental value. Both appraisers were highly qualified by education and experience to render an expert opinion. Since neither expert was able to identify comparable lease transactions within the Indianapolis region,

each resorted to an alternate method. Respondent's expert, Michael C. Lady (Lady), arrived at a figure of $65,000 ($260 per acre) by comparing the subject property with certain nursery properties under long-term lease in the vicinity of the Chicago metropolitan area. Petitioner's expert, Stephen L. Cobb (Cobb), used financial theory to calculate a market rate of return on the appraised value of the subject property. He conservatively estimated this return at $111,500 ($446 per acre), but values of $139,000 to $156,000 would have provided the lessor with a more reasonable return in his opinion. Petitioner bears the burden of proof. Rule 142(a). Accordingly, the question for the Court to decide is whether petitioner, through its expert, has justified rental payments in excess of the amount of $65,000 adopted by respondent in her revised determination.

The first step in Cobb's analysis was to determine the fair market value of the subject property as of June 1990, assuming based on neighborhood growth trends that its current agricultural use was an interim use and that residential development was likely in the near future. For each tract Cobb identified six sale transactions in the neighborhood involving vacant land with comparable characteristics. After making certain adjustments to correct for significant differences, such as size, utilities, and zoning, he appraised tract at $593,000 ($4,800 per acre) and tract B at $278,000 ($2,200 per acre). The aggregate value of the subject property in Cobb's opinion was therefore $871,000

(about $3,500 per acre). Respondent challenges the reliability of Cobb's appraisal on several grounds. Respondent argues that three of the sale transactions used to support the valuation of tract A are unrepresentative because two of the properties are located within the city limits of Greenwood, where residential development is more advanced than in the immediate environs of the subject property, and the third is known to have been sold to a developer for residential subdivision. The weakness in this argument is that respondent concedes that the other sales comparables used by Cobb to value tract A and tract B are unbiased and consistent with the fair market value determined by her own expert, and yet all of these properties were also located in Greenwood and some were intended for immediate residential development, like the comparables which respondent believes to be unrepresentative.

Respondent also points out the large discrepancy between the $593,000 value Cobb assigns to tract as of 1990 and the $228,500 price at which it was acquired by the Maschmeyers in 1989. Cobb explained this discrepancy by the fact that the Maschmeyers acquired tract A in the settlement of an estate; hence in his view the price of that acquisition had not reflected the property's fair market value. A more serious problem in Cobb's appraisal is the discrepancy between his values for tract A ($4,800 per acre) and tract B ($2,200 per acre). The only important difference between the tracts is that one has access to

a sewer and the other does not. This difference is important: in reconciling the sales comparables to the subject property, Cobb used an adjustment factor of plus 60 percent or minus 30 percent to correct for inferior or superior utility service relative to the subject property. Yet, if tract B were correctly valued at $2,200 per acre, application of Cobb's adjustment factor would yield a value for tract A of $3,520 per acre. On the other hand, if tract A were correctly valued at $4,800 per acre, application of Cobb's adjustment factor would yield a value for tract B of $3,360 per acre. Either way there is a sizable residual discrepancy that Cobb has not explained. That only 70 percent of tract A is currently tillable makes the discrepancy all the more puzzling. Respondent reasons that Cobb has grossly overstated the value of tract A. An alternative interpretation, however, is that Cobb understated the value of tract B. The inconsistency calls into question the reliability of Cobb's appraisal.

The next step in Cobb's analysis was to calculate the amount of rental income that a hypothetical investor in the subject property would require. This was accomplished by multiplying the estimated fair market value of each tract by a "built-up" rate. This rate is the sum of (1) the risk-free rate of return for a term of years equal to that of the lease, represented by the yield of 8.77 percent on 5-year U.S. Treasury bonds as of April 1990; (2) a minimum risk premium of 2 percent, reflecting the

riskiness associated with investment in real estate; and (3) a minimum soil depletion factor of 2 percent, reflecting a conservative forecast of the loss of topsoil through nursery cultivation.  Cobb's conservative estimate of the required rate of return is thus 12.77 percent.  Although Cobb believes that more reasonable estimates of each component would imply a rate of return in the range of 16 to 18 percent, Cobb adopted the conservative figure in his conclusions:

$$\text{Required rent} = (\$871,000)\ (12.77\%)$$
$$= \$111,227^{2}$$

Respondent contends that "Cobb committed a fundamental error in financial analysis" by computing the hypothetical investor's rate of return on investment in terms of the fair market value of the subject property instead of the original investment cost. The Maschmeyers purchased the tracts for a total of $461,000.  If Cobb had multiplied his estimate of the required rate of return by this amount, his conclusion would have been an annual rent of less than $59,000, an amount which does not exceed the deduction respondent has allowed.

We believe respondent misconstrues what Cobb's required return attempts to measure.  As we understand it, his calculation is based on the opportunity cost as of mid-1990 of holding the subject property.  The opportunity cost of an investment is the

---

[2] Cobb's figure is $111,562.  This discrepancy is due to rounding.

highest alternative return from assets of equivalent risk which the investor forgoes as a result of his investment.[3]  Where, as here, the fair market value of an asset substantially exceeds the cost of acquisition, it would make little sense to measure the opportunity cost of holding the asset by the return that the investor could otherwise earn on the cost of the investment, since he could sell the asset at its higher fair market value and reinvest the proceeds.  Thus, the amount that Cobb's hypothetical investor forgoes by holding the subject property as of mid-1990, and which the land must yield in order to induce him to continue holding it, is the amount that the current cash value of the land would yield if this sum were invested in financial assets of equivalent risk.[4]

In other respects, however, Cobb's methodology seems to us unsound.  First, we are not convinced that a 2-percent allowance should be made for soil depletion.  Respondent's expert testified that information he received from other nursery operators whom he interviewed suggests that topsoil loss over the limited period

---

[3] See generally Brealey & Myers, Principles of Corporate Finance 87-88, 248-249 (2d ed. 1984).

[4] The capital gains tax that would be incurred in this alternative reinvestment strategy represents a cost that would reduce the return from the alternative investment relative to the return from holding the land.  Ideally this should be taken into account.  However, the size of this cost would depend upon the hypothetical investor's effective tax rate and whether the tax was spread out over multiple years by use of an installment sale, matters as to which we have no information.

over which agricultural use of the land is expected to continue would probably be much less than Cobb estimates. Moreover, the value of the land for residential use would not decline with moderate amounts of topsoil loss, because less topsoil is needed for this purpose. Maschmeyer himself, through careful and well-informed calculations submitted for the record, estimated that $9,125 per year would compensate him for soil depletion. This represents only 1.05 percent of the fair market value determined by Cobb.

More importantly, Cobb's analysis fails to take into account changes in land value. If one measured the return from corporate stock solely in terms of dividend yield, one would not be able to explain why so many investors hold stock as an alternative to corporate bonds offering much higher coupon yields. The investor's total return from land is the sum of the periodic income plus capital appreciation minus any depreciation in the land owing to soil depletion. By omitting an appreciation factor, Cobb's equation overstates the amount of rent that an investor would require.

Omission of an appreciation factor is also inconsistent with characterization of agriculture as only an interim use, a major premise of Cobb's fair-market value appraisal. If the return from the agricultural use in the form of annual rent were sufficient to satisfy the investor, then agriculture would be the highest and best use of the land. The phenomenon of speculative

appreciation in and around the neighborhood of the subject
property due to the expectation of, and opportunities for,
residential development is one empirical fact on which both
experts agreed, and it plays a central role in their assessment
of the market.  As Cobb in his report observes:

> This vacant land is in the likely path of
> development and would be appealing to a potential
> developer as demand is increased.  This investor would
> be interested in holding the property in anticipation
> of a future reward for the investment as utilities are
> extended toward the subject.

> The subject's proximity to employment centers,
> surrounding land development and extended utility
> development supports the speculative attitude toward
> the subject tracts, especially tract A.  It is obvious
> that the subject has the potential for becoming
> speculative land.

It is clear that an analysis of an investor's total return
from the land should take into account the rent plus actual or,
more appropriately, expected appreciation.  The difficulty is to
estimate the rate of appreciation.  Lady used a figure of 4
percent per year to correct for time differences in the four
comparable sales transactions that he identified in the
neighborhood of the subject property between 1990 and 1992 as the
basis of his fair market value appraisal.  If we used 4 percent
as a measure of the return received by an investor in the form of
land appreciation, and limited the soil depletion factor to
1.05 percent, we would adjust Cobb's equation as follows:

Required rent + 4% = ($871,000) (8.77% + 2% + 1.05%)
     Required rent =   $68,112

The basis for Lady's 4-percent figure is not evident from his report, but as an estimate of the expected rate of appreciation during the years at issue it seems very conservative.  The consumer price index for the 2 years prior to April 1990 was increasing at 4-1/2 to 5 percent.  An investor holding land for interim agricultural use in the vicinity of substantial residential development could presumably have expected it to appreciate significantly in excess of the general inflation rate.  Information in the record is not sufficient for the Court to estimate what rate of appreciation an investor could reasonably have expected.  Suffice it to say, however, that if we selected a rate even one-half percentage point higher than 4 percent, the required rent implied by Cobb's equation would no longer exceed the amount determined by respondent.

$$\text{Required rent} = (\$871,000)\,(7.32\%)$$
$$= \$63,760$$

Accordingly, Cobb's analysis does not persuade us that respondent's determination is incorrect.

Our result would not be materially different if we constructed an arm's-length rent in a manner similar to that used by Maschmeyer and petitioner's accountant.  The rental amount determined by respondent would cover the Maschmeyers' actual costs and provide a reasonable return for ownership risk.

In his computation Maschmeyer allowed $26,004 for the Maschmeyers' average borrowing costs.  Why this amount exceeds

the mortgage interest deductions claimed on the Maschmeyers' individual tax returns for the years at issue was not satisfactorily explained.  The average of the amounts claimed on the returns is $20,584.  To this we add the annual allowance for soil depletion that Maschmeyer carefully calculated and used in his computation; viz., $9,125.  These are the lessors' costs.  We can also include in the arm's-length price the $25,000 location premium that Maschmeyer calculated based on the savings to the corporation in labor and fuel costs.  It is an elementary fact of real estate markets that land is not fungible, and locational differences can account for significant price differences within a competitive market.  Because contiguous acreage is more valuable to petitioner than otherwise identical property situated at a distance, even if the land owner were an unrelated party negotiating at arm's length he would be in a position to capture at least some of the premium value that the land would generate in petitioner's operations.

Maschmeyer included in the rent an additional amount representing a 10-percent return on investment ($46,592).  In support of this item he noted that the return per acre for a nursery operation is approximately 25 times that from typical farming operations.  We think this item is unwarranted for three reasons.  First, the return per acre is a function not only of land but also of labor and capital inputs.  Maschmeyer apparently made no attempt to quantify the relative contribution of each of

these three factors of production in nursery operations. Consequently, this comparison is of little, if any, probative value. Second, the location premium itself represents pure profit, which ought to be included in the landowner's return. Third, a rate of return as high as 10 percent has not been justified. Petitioner's own expert estimated that a 2-percent premium would adequately compensate an investor for the risks of ownership. The $25,000 location premium alone provides more than that, measured either in relation to the Maschmeyers' original investment cost or the current value of their investment. Finally, Maschmeyer included in his calculation a base rental amount equal to the market rent for land used to grow corn and beans ($37,500 or $150 per acre). We fail to see the relevance of this item and accordingly exclude it. The total of the justifiable items enumerated above does not exceed $65,000.

```
$20,584  average borrowing cost
  9,125  depletion cost
 25,000  location premium/profit
 54,709
```

We need not make our own determination of fair rental value. Petitioner has justified no more than the amount allowed by respondent.

## 2. Depreciation Deductions

Respondent disallowed depreciation deductions claimed by petitioner for improvements to a residence occupied by Maschmeyer during the years at issue. Section 167 authorizes a depreciation

deduction equal to a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business.  In determing whether living accommodations provided to a corporate employee constitute property used in a trade or business for purposes of section 167, this Court has taken into account the requirements of section 119:  (1) The living accommodations are furnished on the business premises of the employer; (2) they are furnished for the convenience of the employer; and (3) the employee is required to accept such living accommodations as a condition of his employment.  The third requirement can be satisfied by a showing that acceptance of the accommodations was necessary in order for the employee properly to perform his duties, as for instance, where he must be available for duty at all times on the premises of the employer.  Johnson v. Commissioner, T.C. Memo. 1985-175; J. Grant Farms v. Commissioner, T.C. Memo. 1985-174; sec. 1.119-1(b), Income Tax Regs.  Thus, in the companion cases of Johnson and J. Grant Farms we held that a corporation in the business of farming was entitled to deduct depreciation on a residence used by its sole owner/farm operator because he was required to live on site in order to be available for duty at all times in connection with his managerial responsibilities.  Petitioner bears the burden of proving that its deductions are allowable.  Rule 142(a).

The dispute between the parties focuses on the third requirement.[5]  Respondent argues that because Maschmeyer was employed as petitioner's president, in order to satisfy the third requirement petitioner must demonstrate that Maschmeyer was required to use the residence in order to perform his executive duties.  In respondent's view, petitioner has not satisfied its burden.

We are not persuaded by respondent's logic, which reflects an unduly narrow understanding of the scope of Maschmeyer's executive duties.  Maschmeyer testified that petitioner needed someone on the premises at all times for the security of its 500-acre nursery and valuable equipment, for supervision of resident migrant workers, and for shipment of trees after business hours during the busy harvest season.  He testified that for more than a decade the residence was occupied by the foreman who performed these duties.  He testified that he assumed these duties when the foreman secured employment elsewhere.  Maschmeyer's testimony was credible and uncontroverted.  It is clear from the nature of these duties that they required presence on-site at all times during the work week.  If Maschmeyer had not been required by his responsibilities to reside on-site, there would be no explanation for the fact that he continued to live

---

[5] Both parties seem to have taken it for granted that improvements to a residence should be treated no differently from the residence for purposes of this analysis.  We shall therefore do likewise.

there after his family moved to a different home in 1989. No evidence was offered from which we can properly infer any other reason for this separation.[6] That Maschmeyer served as petitioner's president is beside the point. His use of the residence was necessary to petitioner's business as described above. We are satisfied that the residence was used in petitioner's business for purposes of section 167.

Respondent attaches great importance to the fact that the improvements commenced immediately after Maschmeyer became sole shareholder. From this respondent infers that the improvements were made to benefit Maschmeyer as a shareholder rather than as an employee. There is no support in the analogous cases, J. Grant Farms v. Commissioner, supra, and Johnson v. Commissioner, supra, for the proposition that because the farm operators who lived on site were also sole owners of the corporation, the accommodations were being furnished to them in their capacity as shareholders. Inasmuch as Maschmeyer continued throughout the taxable years at issue to perform the employment duties for which the corporate residence was made available to him, we find that any distinction between benefits he received as an employee and benefits he received as a shareholder is not

_____

[6] We are not persuaded otherwise by the evidence that he is currently in the process of obtaining a divorce. We find that he was required to live on petitioner's property in order to discharge his responsibilities as manager of petitioner's business.

dispositive.[7] Petitioner has satisfied its burden of proving that disallowance of the depreciation deductions on the grounds adduced therefor by respondent was improper.[8]

## 3. Accuracy-Related Penalty

Section 6662 provides for a penalty equal to 20 percent of any portion of the underpayment that is attributable to negligence or disregard of rules or regulations.  Sec. 6662(a) and (b)(1).  Negligence generally is defined as lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 942 (1985); cf. sec. 6662(c).  The penalty can be avoided by good faith reliance on the expertise of a professional adviser after full disclosure of relevant information.  United States v. Boyle, 469 U.S. 241, 250-251 (1985); Patin v. Commissioner, 88 T.C. 1086, 1129-1131 (1987), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186

---

[7] Cf., e.g., Gill v. Commissioner, T.C. Memo. 1994-92, affd. ___ F.3d ___ (6th Cir. Jan. 23, 1996), where we disallowed depreciation deductions claimed by a corporation with respect to a residence furnished to its shareholder-employee, because the primary purpose for the corporation's acquisition and maintenance of the residence was to serve the shareholder's personal benefit.

[8] The deduction provided by sec. 167 is limited to a reasonable allowance.  Respondent has not challenged the depreciation deductions on the ground that the expenditures for a pool, pool house, master bedroom, interior redecorations, and the like were extravagant or extraneous to the business purpose of the residence.

(4th Cir. 1988), affd. sub nom. <u>Skeen v. Commissioner</u>, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989); <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972); sec. 6664(c)(1); sec. 1.6664-4(b)(1) and (2), <u>Example</u> (<u>1</u>), Income Tax Regs.  Reliance on an adviser will not immunize the taxpayer from liability, however, where the taxpayer knew or should have known that its adviser lacked sufficient knowledge regarding the subject matter of the consultation.  <u>Patin v. Commissioner</u>, <u>supra</u>; <u>Ellwest Stereo Theaters v. Commissioner</u>, T.C. Memo. 1995-610; sec. 1.6664-4(b)(1) and (2), <u>Example</u> (<u>1</u>), Income Tax Regs.

It is undisputed that Maschmeyer relied on the advice of petitioner's accountant, Wagner, in determining a rental for the lease of tracts A and B, and in preparing the corporate tax returns reflecting these rental payments.  Respondent argues that the penalty is nevertheless appropriate because Maschmeyer did not rely on the advice of a real estate appraiser.  Respondent's argument is unwarranted on the particular facts of this case. Maschmeyer is highly knowledgeable about a business he has been engaged in for 20 years.  Wagner is a C.P.A. with many years' experience in tax return preparation and thorough familiarity with petitioner's tax and financial situation.  It was not unreasonable for Maschmeyer to believe that together they could determine an arm's-length rent that accounted for all relevant business and financial factors.  Their testimony and the exhibits

they prepared explaining how the rental was derived display a conscientious, if not wholly convincing, effort to arrive at an accurate appraisal.  As the wide discrepancy between the appraisals presented to the Court by the parties' experts, Lady and Cobb, illustrates, the making of an appraisal is not an exact science.  We are satisfied that Maschmeyer's conduct on petitioner's behalf was consistent with ordinary business care and prudence.

Indeed the $140,000 rental deduction claimed by petitioner on its tax returns falls squarely within the range that Cobb, in his expert opinion, considered reasonable ($871,000 x 16% = $139,360; $871,000 x 18% = $156,780).  Thus, petitioner's valuation was in fact consistent with that of a professional real estate appraiser.

The accuracy-related penalty does not apply.  To reflect the foregoing,

Decision will be entered under Rule 155.